Kraemer Hosiery Co. et al. *v.* American Federation of Full Fashioned Hosiery Workers et al.

Appeal of Lewis Francis Budenz.

Argued February 2, 1931. Before FRAZER, C. J., WALLING, SIMPSON, KEPHART, SADLER, SCHAFFER and MAXEY, JJ. Affirmed.

208

*Orrin E. Boyle,* for appellant.—An injunction will not be sustained where the offenses alleged are not proven to have been committed or threatened: Bussier v. Weekey, 11 Pa. Superior Ct. 463.

Equity should not restrain a labor union and its representatives from peacefully persuading employees to join their union, where such employees were induced, without receiving legal consideration, to sign individual promises not to join that union and to leave their employment if they did, by being threatened by their employers with loss of their jobs if they would not sign, and by other overreaching conduct and smart bargaining: Reynolds v. Boland, 202 Pa. 642, 648; Weegham v. Killefer, 215 Fed. 168; Deweese v. Reinhard, 165 U. S. 386.

The contract relied upon by the plaintiff, whatever its status at law, fails in equity because of the over-reaching conduct and smart bargaining of plaintiffs in obtaining it: Pope Mfg. Co. v. Gormully, 144 U. S. 224; Friend v. Lamb, 152 Pa. 529.

Where, as here, a contract is rooted in a disparity in the bargaining power of the parties, and the contract is harsh, unfair and inequitable, courts will supervise and alter that contract in order to work justice, even though the contract is founded on sufficient consideration and is otherwise valid.

The plaintiffs' privilege to refuse to hire or to discharge men for membership in the defendant union does not include the power to procure an enforceable promise that they shall not join a union.

The defendant's conduct is fully justified in that it is wholly privileged: American Steel Foundries v. Tri-City C. T. Council, 257 U. S. 212; Jefferson & Indiana Coal Co. v. Marks, 287 Pa. 171.

An injunction should not issue against any inducement of a breach of an invalid contract.

An injunction cannot be issued against the defendants on the ground that they are seeking to accomplish an un-

lawful purpose: Jefferson & Indiana Coal Co. v. Marks, 287 Pa. 171; Rutland Marble Co. v. Ripley, 77 U. S. 339; Gavieres v. U. S., 220 U. S. 338; Iron City Laundry Co. v. Leyton, 55 Pa. Superior Ct. 93; Central I. & S. Co. v. Harrisburg, 271 Pa. 340; Hutchinson B. Co. v. Marvel, 270 Pa. 378.

The promise in a work contract not to join a union is not within the category of promises the inducement of the breach of which equity will enjoin: Hitchman C. & C. Co. v. Mitchell, 245 U. S. 229; Flaccus v. Smith, 199 Pa. 128.

The conduct of plaintiffs and others after the time alleged in the bill cannot justify a restraint of defendants in equity.

A promise not to join a labor union is opposed to public policy, and therefore void: Pope Mfg. Co. v. Gormully, 144 U. S. 224.

*C. F. Smith*, of *Smith & Paff*, for appellee.—Plaintiff company, in the contracts of employment, at all times gave the employee the right to withdraw from the employment, and even if the employee joined the union or wished to join a union and wished to solicit members for the union, these rights were not taken away from him by the contract of employment, but he could not belong to a union and solicit members for a union and remain in the employment of the Kraemer Hosiery Company. This is a right, which has been recognized by the courts, that the employer has. This right has been recognized not only by the laws of the State of Pennsylvania and the laws of the United States, but by the laws of our sister states: Flaccus v. Smith, 199 Pa. 128; Hitchman C. & C. Co. v. Mitchell, 245 U. S. 260; Eagle G. & Mfg. Co. v. Rowe, 245 U. S. 275; Montgomery v. Ry., 293 Fed. 681; Am. Steel Foundries v. Tri-City Central Trades Council, 257 U. S. 184.

OPINION BY MR. CHIEF JUSTICE FRAZER, October 9, 1931:

Plaintiff company, owner and operator of a hosiery mill at Nazareth, Northampton County, filed its bill in this case to restrain the American Federation of Full Fashioned Hosiery Workers, a national organization, one of its local branches and its officers and other designated persons (among them, appellant), acting for the local union or for the superior body of which it is a part, from interfering with plaintiff's employees. The bill alleged attempts by defendants to induce plaintiff's workers to join defendant union, though knowing that by so doing the workers would violate the terms of the written "individual contract" under which they were respectively employed by plaintiff. A preliminary injunction was issued, which after answer and hearing was made permanent. Budenz, who was not an employee of plaintiff, nor a member of either the national or local organizations, alone has appealed.

After consideration of the voluminous record, we are convinced that it would serve no useful purpose to discuss at length the legal points argued, as the chancellor's findings of fact are controlling, and the law as applied to them is clear. Briefly stated, the controlling findings are: Plaintiff company does not recognize any labor union, and employs approximately 700 persons, of which number, 241 men and women are workers in its hosiery mill. On June 20, 1929, plaintiff requested each of its employees to sign what the pleadings refer to as an "individual contract." The terms of this contract were: that the signer was not a member of the American Federation of Full Fashioned Hosiery Workers, or affiliated with it or similar organizations, that if the signer concluded to join an organization of the character of the bodies referred to, he would withdraw from plaintiff company's employ and not before that time make efforts to unionize the other employees, and that he understood plaintiff company was to "run non-

union, and agrees with me that it will run non-union while I am in its employ." The court found that the hosiery company practiced no fraud or duress in inducing its employees to sign the agreement, and that each signer was afforded full opportunity to read and understand the contract before adopting its terms.

The court found that Budenz, an attorney-at-law residing in the City of Rahway, New Jersey, and White, the secretary of the Reading Branch, Local No. 10, as representatives of the American Federation of Hosiery Workers, of which defendant union is a branch, visited Nazareth and by addresses, both spoken and written, at meetings attended by plaintiff's employees, induced a number of the company's employees to violate their agreement with plaintiff and enroll in defendant union, and that they, Budenz and White, published and distributed pamphlets among plaintiff's employees, which the court found were for the purpose of unionizing such persons, inducing them to violate their contracts and exciting the minds of Nazareth citizens against plaintiff company.

Seven employees having affiliated themselves with the union in violation of their contracts, were dismissed from plaintiff's employ, which action upon the part of plaintiff resulted in a sympathetic strike by a portion of the remaining employees, and, as the court found, those not striking have been interfered with and annoyed by threats, statements of intimidation, and picketing, brought about by the printed matter issued by defendants. Appellant himself was one of the pickets and his claim that defendant's actions were legal and peaceably persuasive was not sustained by the chancellor.

The court's findings also state that, previous to defendants' interference, the relations between plaintiff company and its employees were satisfactory and peaceable, and no complaints were made by the latter as to wages, length of hours and working conditions, that "the combination between the defendants to accomplish the

unionization of plaintiff and to induce plaintiff's employees to violate the individual contract which each signed on or about June 20, 1929, was an illegal and malicious conspiracy," and that the direct and immediate effect of such efforts was injury to plaintiff of a character that would result to it in great financial loss if not restrained. Throughout, defendants had knowledge of the contracts and their terms. These contracts were mutually binding; their provisions and the method of their procurement, upon the facts as found, were not against public policy. As this court said in Flaccus v. Smith, 199 Pa. 128, 136, "The appellee had an unquestioned right, in the conduct of his business to employ workmen who were independent of any labor union, and he had the further right to adopt a system of apprenticeship which excluded his apprentices from membership in a union. He was responsible to no one for his reasons in adopting such a system, and no one had a right to interfere with it to his prejudice or injury." In American Steel Foundries v. Tri-City Central Trades Council et al., 257 U. S. 185, 209, the court said of labor unions, "they may use all lawful propaganda to enlarge their membership," but "the principle of the unlawfulness of maliciously enticing laborers still remains and action may be maintained therefore in proper cases...... The elements to sustain actions for persuading employees to leave an employer are first, the malice or absence of lawful excuse, and, second, the actual injury." The chancellor's findings, amply supported by the evidence, establish both these elements. Appellant's contention that the measures resorted to in this case were lawful simply because they stopped short of physical violence or coercion through fear of it, is not sustainable. Such violation of plaintiff's legal and contractual rights as to the facts here show it to be,—irrespective of the fact that breaches of the peace by defendants were not shown,—a violation entitling plaintiff to equitable relief, as has been held where other combinations were formed to procure con-

certed breaches of contract by an employer's employees: Flaccus v. Smith, 199 Pa. 128; George Jonas Glass Co. v. Glass Bottle Blowers' Assn., 77 N. J. Eq. 219. See also Hitchman Coal & Coke Co. v. Mitchell et al., 245 U. S. 229. As we have frequently and recently said, where the findings of the chancellor are affirmed by the court in banc, which is the case here, and upon appeal such findings appear to be supported by proof sufficient to require their submission to a jury in a trial at law, we will not disturb these findings: Foley v. Barnett, 303 Pa. 218, and cases there cited.

As to this appellant, however, the decree must be modified. He contended below and here that the contract between plaintiff and its employees was illegal and unenforceable. This was a mistake. The fact that neither party thereto was bound for any definite term, but only while the relation voluntarily continued, does not vitiate the contract. Plaintiff had exactly the same right to refuse to employ union members, whether for a definite or an indefinite term, as its employees had to refuse to enter its employ for such term, except as members of the union. Plaintiff had the same right, unless controlled by a contract, to refuse to continue in its employ those who had become union members, as its employees had to refuse to continue in its employ unless it discharged all but union members. It follows that plaintiff's agreement that "If at any time while I am employed by the Kraemer Hosiery Co. [plaintiff] I want to become connected with the American Federation of Full Fashioned Hosiery Workers' Union, or any organized labor body, I agree to withdraw from the employment of said company, and agree that while I am in the employ of that company I will not make any efforts among its employees to bring about the unionization of that factory against the company's wishes," was a valid and binding contract, and appellant's oft-repeated contention to the contrary is wholly in conflict with the decisions of this and other appellate courts. That agreement did not pre-

vent the employees from later becoming members of the union—their right so to do, is, on the contrary, distinctly recognized,—but merely required them to withdraw from plaintiff's employment should they thus change their status; and it did not prevent them from making efforts to unionize the factory,—for their right to do this is also distinctly recognized,—but simply required them, so far as concerned making such "efforts among its employees," to refrain from so doing "while I am in the employ of that company." Assuming plaintiff was privileged, as we have shown it was, to have its factory operated exclusively by non-union employees, the regulations quoted were, according to the decisions of this and other appellate courts, both reasonable and proper to that end, the employees were without right to violate them while their employment continued, and appellant and those associated with him were not privileged to combine together, as admittedly they did, to induce the employees to breach their respective contracts.

On the other hand, appellant was free to act, by peaceful persuasion, at a proper time and in a proper way, by the spoken, written or printed word, to induce employees who had signed those agreements to withdraw from plaintiff's employ and affiliate with the union, and, as already stated, their contracts recognized that privilege. Had this been the course pursued an injunction could not properly have been granted. Appellant also had the right, at a proper time and in a proper way, to point out to plaintiff's employees that their contracts, whether legal or illegal, were unwise, and hence the employees should exercise their privilege to "withdraw from the employment of said company." This much is secured to the citizen by the constitutional provision that: "The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty." This declara-

tion is no higher, however, than the one which sustains the inviolability of legal contracts, and hence any attempt, by speaking, writing or printing, wrongfully to induce an employee to break his contract with his employer, thereby causing irreparable injury to the latter, makes the one so acting "responsible for the abuse of that liberty." It is not always easy to determine when speaking, writing and printing becomes an actionable abuse, especially in labor troubles, but, as we have already pointed out, this difficulty does not exist in the present case. We accordingly approve the granting of an injunction against appellant, but modify the final decree as regards him, so that it shall provide as follows:

"That appellant, Lewis Francis Budenz, his agents, servants, employees and every of them, be and they hereby are perpetually enjoined and restrained from using threats or intimidation, from sending libelous and scandalous letters, pamphlets or newspaper, and from picketing plaintiff's plant in combination with others, for the purpose of inducing or attempting to induce employees of the Kraemer Hosiery Company, plaintiff, while still in its employ, to become connected with the American Federation of Full Fashioned Hosiery Workers, or any of its local branches, or with any other organized labor body, or for the purpose of inducing or attempting to induce them to make efforts to bring about the unionization of plaintiff's factory."

As thus modified the decree of the court below is affirmed and the appeal is dismissed at appellant's costs.

CONCURRING OPINION BY MR. JUSTICE KEPHART:

In discussing the so-called individual contract between the hosiery company and its employees, it should be determined, first, whether it created a property right separate and distinct from that arising from the usual and ordinary relation of employer and employee when no such writing exists; and, second, if it is a contract, whether it is necessary to its existence as a contract to

uphold the action of Judge STEWART in granting the injunction.

I am of the opinion that the so-called individual contract considered in connection with or as part of the contract arising from the relation of employer and employee is not a contract as that term is understood in law. What it attempts to do lacks the important element of consideration. The promises of both employer and employee are illusory. Neither employer nor employee binds himself to any fixed term of employment, nor to the wages to be paid. Although the employer promised to run his plant nonunion while the employee was in his employ, and the employee agreed not to join the union while he was in his employ, either could terminate the employment at will. "A promise to employ as long as it suits the employer is insufficient consideration. And in any case where a promise in terms or in effect provides that the promisor has a right to choose one of two or more alternatives, and by choosing one will escape without suffering a detriment or giving the other party a benefit, the promise is insufficient consideration." Williston on Contracts, volume 1, section 104, page 219. No legal damage could be predicated on the fact that an employer decided to run a union shop, or, on the converse of it, a non-union shop. Everything attempted to be protected or guaranteed by the individual contract existed without it as a lawful right appertaining to the relation of employer and employee, if and when either of them attempted to exercise any of the rights intended to be thus protected. Reducing the elements of such relation to writing does not add anything to their force or validity. Since the so-called individual contract added nothing to the employee's or employer's right in their relation as such, and did not take away any right from either while in that relation, it created no property right that differed in any way from the ordinary relation of employer and employee.

A similar view as to such contracts appears to be the ground on which the recent New York labor disputes were decided. See Exchange Bakery and Restaurant, Inc. v. Rifkin, 245 N. Y. 260. While there was no promise on the part of the employer to run his shop nonunion, apparently this difference was of no moment, as appears from Interborough Rapid Transit Co. v. Lavin, 247 N. Y. 65, at page 79: "Though the plaintiff's employees are prohibited by the plaintiff from joining that association or union, the union may, despite the prohibition, attempt to recruit its members from those employees at least where the prohibition is not part of a contract of employment for a definite term."

Something is said concerning an employee secretly joining the union and continuing his employment under such individual contracts; while so doing he would be acting under a lie, and it was urged that courts should recognize this abuse of the relationship of employer and employee and enforce the terms of this agreement. It may be that such a situation could arise; but such a promise amounts to no more than the implied promise in every contract of employment that the employee while in service will conduct himself in a gentlemanly way toward his employer and his work. Such promise does not create a right protected by the Fourteenth Amendment of the federal Constitution nor does the power of the court extend to the punishment of such wrongs. Courts cannot take cognizance of acts of this kind; if they did, there would be no limit to the volume of their business. It is only when a lie hurts in terms of legal damage that the constitutional inhibition may be invoked or that courts will act.

Therefore, I would treat the case as though the individual contract did not exist and as one wherein the relation or status of employer and employee was at stake and was unlawfully interfered with by third parties.

From the relation of employer and employee certain rights arise to both. One of the rights is that the rela-

tionship shall not be unlawfully interfered with. This relation is unlawfully interfered with when third parties maliciously induce an employee to leave his employment, or use abusive, libelous, deceitful and threatening measures to persuade him to leave that employment; or, where the employer, on the other hand, by similar methods, is induced to discontinue the employment of his employees: American Steel Foundries v. Tri-City Central Trades Council, 257 U. S. 184. Every act of persuasion or every act inducing the termination of employment is not illegal: American Steel Foundries v. Tri-City Central Trades Council, supra, at pages 208, 209; Hitchman Coal & Coke Co. v. Mitchell, 245 U. S. 229, at page 273.

There is no question that after August, 1929, there was concerted action by the appellant and others to organize a union in the Kraemer plant. That is not denied. Nor would such concerted action to do a lawful act be an unlawful conspiracy. If, however, the means employed to attain their ends is legally condemned, the original act as well as subsequent ones would have all the elements of an unlawful conspiracy.

Coming now to consider the acts which brought about an unlawful conspiracy, the first to be mentioned are the articles reproduced in the record. It is not denied that appellant, with others, in their concerted action to organize a union, agreed to use as one of the methods the articles complained of, and to circulate them directly among the employees. They were singled out as the persons to be directly acted on by the method above stated, and by mailing copies to them. Appellant Budenz does not deny writing the articles nor does he deny the purpose or effect intended by the articles. Defendants were out to form a union and they used the most convenient means at command. The articles were intended to create dissatisfaction and unrest among the workers, to hold the officials of the Kraemer Company up to ridicule, to cause the employees to feel that it would be beneath their

position as men and women to associate with or work for the men mentioned in these articles, and ultimately to organize a union in the plant so that the employees could be fully protected in all their rights. The articles were abusive at times, also at times unfair, and in certain instances parts were untrue. We are then not left to conjecture as to the actuating influence which caused some of the employees to join the union. This was done by at least seven, and when they were discharged from employment for that reason, as the employer had a legal right to do, the natural result followed. The rest of the employees, or the greater part of them, twenty only remaining of 240, walked out in sympathy with those discharged.

The company's officials could have prosecuted the authors and publishers of these articles for libel, both civilly and criminally. In view of Near v. Minnesota, 283 U. S. 691, I will not discuss the power of courts to restrain future publication of libelous articles by the organ of the federation, even though done to influence the public mind, or to cause breaches of the peace, so long as there is no personal undertaking to injure directly an individual's business by reason of the publication; nor should the courts exercise the strong arm of injunction merely to aid one of the parties in a labor dispute because such libelous articles were published and circulated generally.

But where appellant Budenz clearly overstepped any protection afforded him by the law or by Near v. Minnesota, supra, in relation to such publications, when, in addition to writing these articles and publishing and circulating generally the newspaper in which they were published, he personally appeared at the gates of the plant and distributed them to the employees as they left the plant such acts, followed by others which I shall note, created an unlawful conspiracy which may be enjoined, even though equity may not restrain a newspaper from future publications of such libels. While defendants

might not be enjoined from inducing others by lawful means to leave plaintiff's service and join the union, such purposes could not be effected by unlawful means, such as malicious falsehood, deceit, force, intimidation, or actual injury to plaintiff's property: Interborough Rapid Transit Co. v. Lavin, supra. See also Interborough Rapid Transit Co. v. Green, 131 N. Y. Misc. Rep. 682, and two recent articles in 6 Wis. L. Rev. 21, 26, 30, and 29 Columbia L. Rev. 441.

From this point the acts of Budenz and others which followed, together with the act of personal intervention that preceded, made out a complete case for equitable relief. To secure a complete severance of the relation of employer and employee, close down the plant or secure recognition of the union, the strikers commenced a series of acts which have been held by this court and by the Supreme Court of the United States to be unlawful. These acts are described by the court below as follows: "..... The employees that remained faithful..... were annoyed, not by the defendants, it is true, but by other employees of the hosiery company who were out on strike and these latter endeavored to have...... the employees who remained at work...... leave the employment of the hosiery company. The influence that was brought to bear upon them was by applying opprobrious and vile expressions to those who remained at work, and, in addition to these matters, those on strike picketed the company's plant, and, by expressions which the pickets used, tried to dissuade those who remained at work from continuing in their employment. In some cases violence was resorted to, but the element of violence up to the time of the hearing was inconsequential."

The record presents evidence of picketing on the block where the company's gate is located, during the hours when the employees were going to or leaving work, the pickets being in number far in excess of any that have been held legal. The names of the pickets are given and numbered from eleven to sixteen daily. Among those

picketing were William Montplaisir and Joseph Reinert. These two men were named by Reinert as the ringleaders of the union movement within the factory, and, while the movement was in progress, Budenz, with knowledge of their activity, met them at the home of Reinert, where the situation was discussed. We need not repeat all the testimony on this subject or the evidence as to threats, vile names and other matters that took place.

These were not peaceable acts of persuasion which labor organizations may use to secure members, but were intended to intimidate the workers or force compliance with the demands of the organizers. All these acts are within the preventive power of an injunction, and it is such acts which should be restrained. While appellant was not personally present at all the picketing or other acts mentioned above, the strike and the acts which followed are the natural and logical result of a combination which became unlawful because of the means used to secure the end desired. The appellant was as much responsible for these unlawful acts as though he had actually participated in them.

We have recently passed upon the question of unlawful picketing, in the case of Jefferson & Ind. Coal Co. v. Marks, 287 Pa. 171, where I said, speaking for this court, on pages 175 and 176: "The right of workmen to form associations for the mutual aid, benefit and protection of themselves and each other, in matters of wages and other incidental benefits, has been recognized by the courts and the legislature for many years. [Our acts of assembly] recognize the right of bodies of men to combine and to refuse to work for insufficient wages, or because of inhuman, offensive or unjust treatment, and to procure others to do likewise. Such combinations have elsewhere been declared lawful. Labor unions are therefore not only legitimate but, because their aim and purpose is to better the living conditions of a large part of the body politic, they are a necessary part of the social structure...... It is to be remembered, however, in

connection with this subject, that equality of condition is impossible, but equality of opportunity for each workman is possible, and any abridgment or curtailment of this right is against the fundamental law." See also the opinion of Mr. Justice MITCHELL in O'Neil v. Behanna, 182 Pa. 236.

It is the duty of courts to intervene in the case of unlawful picketing tending to intimidation and violence as directed by the Supreme Court of the United States, the highest court in the land. As Chief Justice TAFT stated in American Steel Foundries v. Tri-City Central Trades Council, supra, 257 U. S. 184, 204, 206, 207: "Persistence, importunity, following and dogging become unjustifiable annoyance and obstruction which is likely soon to savor of intimidation. From all of this the person sought to be influenced has a right to be free and his employer has a right to have him free. The nearer this importunate intercepting of employees or would-be employees is to the place of business, the greater the obstruction and interference with the business and especially with the property right of access of the employer. . . . . . .

"We think that the strikers and their sympathizers engaged in the economic struggle should be limited to one representative for each point of ingress and egress in the plant or place of business and that all others be enjoined from congregating or loitering at the plant or in the neighboring streets by which access is had to the plant, that such representatives should have the right of observation, communication and persuasion but with special admonition that their communication, arguments and appeals shall not be abusive, libelous or threatening, and that they shall not approach individuals together but singly, and shall not in their single efforts at communication or persuasion obstruct an unwilling listener by importunate following or dogging his steps."

I have stated that the so-called individual contract is not, in my opinion, a valid contract in this case, but, even if it were, the acts I have recited would have warranted an injunction though not as broad as Judge STEWART has made it.

Nor is the question of coercion, through stress of economic necessity, before the court. If it were, I would call attention to the dissenting opinion of Mr. Justice BRANDEIS, in the Hitchman Case, supra, 245 U. S. 229, 271, where a similar argument was made that the union was endeavoring to coerce the employer into establishing a union; the question of coercion, either by the employee or employer, was discussed and it was shown that coercion could not exist.

I need not discuss the issue that Budenz, the sole appellant, resident in the State of New Jersey, and here only during the time of this trouble, was a third party not entitled to take advantage of the invalidity of the individual contract even if it had existed. That this principle is thoroughly grounded in the law seems to me not to be open to question. It was recognized in the Hitchman Case, supra. There is an exception where there is a special agency relation existing between the employees and a person authorizing the latter to act for them, but no such agency was disclosed in the trial of this case. See 13 C. J. 398, 508. However, I would place the decision on the broader grounds indicated above.

While this type of contract was upheld in Flaccus v. Smith, 199 Pa. 128, and partially so in the Hitchman Case, supra, the facts in the Flaccus Case are not similar to the ones before us, for in that case there was a definite contract interfered with, which was based on sufficient consideration, and in the Hitchman Case the decision was based primarily upon the disturbance of the status of employer and employee, and was modified by the opinion of Chief Justice TAFT in the case discussed above, American Steel Foundries v. Tri-City Central Trades Council, 257 U. S. 184, at page 211.

I would modify the injunction so as to restrain appellant from committing any of the acts which I have described as being unlawful.

DISSENTING OPINION BY MR. JUSTICE MAXEY:

This is an appeal of Lewis F. Budenz from the decree of the Court of Common Pleas of Northampton County, sitting in equity, perpetually enjoining the defendants, their agents, etc., from in any way interfering with the business of the Kraemer Hosiery Company, especially from inducing, by any means whatsoever, the employees of the Kraemer Hosiery Company to break the individual contracts which they have entered into with the Kraemer Hosiery Company, and from annoying, molesting, threatening, intimidating the employees of the Kraemer Hosiery Company, or sending libelous and scandalous pamphlets or newspapers to them or any of them, with the intention and purpose of inducing them to violate the individual contracts between the Kraemer Hosiery Company and its employees.

The contract protected by this decree is one in which the employee formally agrees with his employer that he will not become a member of any organized labor union without withdrawing from his employment. Convinced as I am that this contract has no claim to the protection of equity and that the appellant, Budenz, was entirely within his rights in publicly criticizing it as unfair and illegal, I dissent from the opinion of this court.

The plaintiff hosiery company in Nazareth, Pa., had 241 employees. They worked in two shifts; the day shift of ten hours duration, the night shift of twelve hours duration, each with a forty-five minute intermission. In 1928 the company made what it called a "wage adjustment," introducing the "two-machine system," whereby a worker, instead of attending alone to one machine, was given a helper, directed to attend to two machines, and was paid a reduced rate per dozen of output. The company claims that the men made as much under

the two-machine system as under the one-machine system, but several employees referred to this new system as a "wage cut" or a "wage reduction," and there was an employee's testimony that "nobody was in favor of it." Defendant Earl White, of Reading, a representative of the American Federation of Full Fashioned Hosiery Workers, after first going to Nazareth on his own accord to make a field investigation, went there in April, 1929, by invitation of a part of the workers of the Kraemer Hosiery Mill. A meeting of workers was held at Easton. White, who was present, testified that the employees there "complained about the type of overseeing, the methods used to speed up production, and long hours," and that he was asked for application cards for membership in the union and some of the employees joined the union.

A. G. Schmidt, president of the plaintiff company, demanded that the employees who had joined the union withdraw therefrom. Four of the employees were discharged for attending the Easton meeting. Schmidt agreed to take these men back if they would give him their union books. They declined to do so. Thirty of the company's employees quit work in sympathy with the discharged men. The employees then called a meeting in Aluta. They could not secure a hall in Nazareth for the reason, as they alleged, that everything there was dominated by the Kraemer Hosiery Company. White was invited to the Aluta meeting. He went to Nazareth and was met there by a group of about twenty-five employees. He then went to the Aluta meeting. He testified that "the immediate problem they had that day was a question of some of the men being told that they either had to tear up their union books or quit their jobs." He told the men to go back to work.

In May, 1929, the plaintiff company entered into an agreement with the Allied Manufacturers' League, Inc., of New York City, whereby the "league" agreed to assist plaintiff company in installing the "Individual Contract

System" at the plant and to secure new employees in the event of a strike. This "league" is apparently owned and managed by one Horace A. MacDonald. On June 8, 1929, MacDonald appeared with mimeographed forms of the individual contract, and that night he and the company's superintendent, Winkler, went to the knitters' floor in the mill, and instructed the night foreman, Bowersocks, to assemble the employees. This was done, and Winkler and MacDonald told the men that they were to sign the individual contracts. Lester Rice, a knitter in the plaintiff's mill, testified that Bowersocks, the foreman, "just called them down there, one by one, to the office to sign that yellow dog contract and we wouldn't sign." For about two hours the importunities to sign continued. MacDonald testified that the men "said it was a yellow dog contract." The men were told to sign or quit work. Nearly the entire night force refused to sign and left the plant at 2 a. m. William Montplaisir, an employee, testified that "there was a lot of discussion about signing it; no one wanted to." The following day Schmidt summoned the day-shift men to his office where, according to the testimony of employees, they were "told to sign or get out. So what was the use of reading it?" Employee Joseph Reinert testified that "there was a pile of them [i. e., these individual contract forms] on the desk," and President Schmidt said to the men that "it will be a long vacation if you don't sign it." Many of the employees were married men with families to support. On June 20, 1929, many of these men, given the choice of signing the contracts or losing their jobs, signed the contracts. Some of the signers were under twenty-one years of age. Some refused to sign the contract and were discharged.

The defendant and sole appellant, Budenz, is, with his activities, so far as they relate to this case, described by President Judge STEWART of the court below in the fourth finding of fact as "a member of the bar, an educated man, a student of and a writer upon economic sub-

jects. He came to Nazareth after June 20, 1929, after the individual contracts had been signed by the employees of the Kraemer Hosiery Company, and from the time of his arrival to the time of the last hearing, he has been active in an attempt to unionize the Kraemer Hosiery Mill workers, and to induce the employees of that company to violate the 'Individual Contract.' His purpose to bring about these results appears not only from his admissions as a witness, but in his various activities as the author of the articles in Exhibits Nos. 2, 3, 4, and 5, which were pamphlets published by Local No. 10, and distributed to the people of Nazareth, and to the employees of the Kraemer Hosiery Company, by his attendance at the meetings which were held, by his speeches, letters, conferences with employees who had joined the union, and other matters referred to in the testimony. There is no evidence that Mr. Budenz counseled any of the employees of the Kraemer Hosiery Company to strike in the present controversy."

Budenz when on the witness stand was asked what his efforts consisted of in having this [anti-union] contract abolished. He replied: "Holding public meetings, in order that the people of Nazareth might understand just what the issues were...... I didn't get that far when the injunction came along. These public meetings were designed to create public sentiment in the community." In a letter dated September 27, 1929, addressed to President Schmidt of the plaintiff company and offered in evidence, Mr. Budenz said: "We believe that the fair way to meet the various issues raised is by the American method of discussion and debate. We are satisfied that the 'yellow dog' contract......cannot be defended in any American forum. We know full well that the long and inhuman hours for the night force are incapable of defense, as also are the wage scales at the Kraemer Mill. Therefore, we again suggest that a frank and gentlemanly debate, before the assembled citizens of Nazareth, would be the effective way to determine the merits of

this controversy, and would also help to advise the citizens of the exact conditions in your mill." Mr. Budenz's invitation to a "frank and gentlemanly debate" was unanswered except with an application five days later for an injunction against him. When under cross-examination at the hearing Mr. Budenz was asked if he did not know that Mr. Schmidt was not a debater, he replied: "He might have employed an eminent attorney to represent him. My idea of a debate is a discussion under well known rules, and both sides state their case."

There appears to be no dispute of the fact that Budenz's activities at Nazareth consisted in holding public meetings to present his views on unionism and on these anti-union contracts, and in writing and circulating pamphlets to the same end.

The issue in this case is not whether the relations between the company and its employees had hitherto been amicable or otherwise, whether the employees were well paid or ill paid, whether they complained or rejoiced. The issue is not whether the company could discharge its employees because they joined a union, or, for that matter, a lodge or a church. These issues are not now before this court and were not before the court below.

There is but one issue in this case, and that is the issue of Budenz's right of free speech—his right to advocate by both written and spoken word the principles of labor unionism and to attack anti-union individual contracts. Not a single act of violence or deceit or intimidation is charged against Budenz. "The head and front of his offending" seems to be that he published and circulated the pamphlets referred to above. These pamphlets bear the title "The Nazareth Hosiery Worker," and the slogan: "Ye shall know the truth and the truth shall make you free." I have read these pamphlets and the excerpts which appellees cite in their paper book. One of these excerpts cited by appellees is the first paragraph in the first column of page 1, volume 1, issued August 13, 1929, being appellees' Exhibit No. 2:

"The Kraemer Silk Hosiery Co. of this city has recently been guilty of a most un-American act against its workers. It has taken a step which violates Pennsylvania's great traditions of freedom, and stamps the company as Kaiseristic and unjust."

Appellees' Exhibit No. 3 is the issue of August 22, 1929. This issue carries in the center of its first page the following:

"The 13th Amendment to the Constitution of the United States says distinctly:

" 'Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.'

"Every thoughtful person can see that the 'yellow dog' contract is a vicious violation of this portion of the Constitution. The 'contract' is also against the very basic ideas of Americanism—that men and women should be free to have such political, religious and economic beliefs as they wish to have. The right to join a trade union is an American right, which no 'contract' can smash or cancel."

Another excerpt which appellees seem to consider as especially calling for injunctive relief, and which in their paper book they class as "degrading and debasing," is as follows:

"The yellow dog slave contract means bad conditions for the workers. It means lower wages than in mills where decent conditions obtain. It means longer hours than should be worked, particularly at night. The Kraemer Company seeks to get its profits out of the hides of its workers rather than out of efficiency in management."

Another excerpt, which the appellees designate as "insidious and vicious," is the following from these issues:

"We feel certain that the Kraemer officials have not fully realized the ridiculous position in which they are

put by this attack on the liberty of American working-men and working-women."

Another excerpt from "The Nazareth Hosiery Worker," Exhibit No. 4, is as follows:

"Ramsay MacDonald, Labor Premier of Great Britain, comes to America on October 4th, to talk Armament Reduction with President Hoover. MacDonald has always been a pacifist.

"Philip Snowden, British Labor Chancellor of the Exchequer......returned from the Hague to a great triumph in England—being hailed by many of those who formerly called him a 'dangerous radical.' "

I have searched the columns of "The Nazareth Hosiery Worker" which plaintiffs put in evidence and I find no incitement to an unlawful act in any of them. I find in them no phrases as offensive as those commonly used in political contests by zealous partisans against candidates for the highest offices in state and nation. Equity is entering a forbidding and hitherto untrodden field if it is to be used to enjoin the making of speeches and the publication of articles that offend the feelings of persons who are in the front line in the age-long and never-ending battle of ideas.

When one reads the court's description of Budenz's activities already cited and the above excerpts from articles written and published by him, and then realizes that the purpose for which an injunction was granted was to put an end to these activities and these articles, the issue in this case stands out completely stripped of all disguises. No violence, threats or intimidation are charged against Budenz or any of these defendants. In the eighth finding of fact, a reference appears to the meetings which Budenz and other labor leaders addressed, and the court says: "There was no disorder or breaches of the peace at any of these meetings." The court also said in its tenth finding of fact: "The element of violence up to the time of the hearing was inconsequential." There being *no violence or intimidation* to be

enjoined, *what* then did the court enjoin? It enjoined in effect the exercise by the defendants of the right of peaceful free speech, because that speech had a tendency to persuade the company's employees that the anti-union contract which they had signed under economic restraint was prejudicial to their welfare, repugnant to conscience and rejectable in law.

I maintain these propositions:

*First:* That the plaintiffs had no standing to ask a court of equity to grant this injunction, because the method used by the plaintiffs in securing the employees' signatures to these contracts was unconscionable and offensive to the canons of fair play.

*Second:* That the individual contract was in law a nullity, the employee having in fact no freedom of choice in signing the contract, no intent to affect his legal relations with his employer, and there being as to him no consideration.

*Third:* That these contracts which the decree protects so oppose sound public policy as to be beyond the pale of the protection of a court of equity.

*Fourth:* That the suppression of the defendants' right of peaceful free discussion cannot be based upon an alleged "contract" to which they were not parties.

As to the first proposition:

"A court of equity acts only when and as conscience demands, and if the conduct of the plaintiff be offensive to the dictates of natural justice, then whatever may be his rights......in a court of law, he will be held remediless in a court of equity": Deweese v. Reinhard, 165 U. S. 386; Reynolds v. Boland, 202 Pa. 642.

Equity regards substance and not form. He who comes into equity must come with clean hands. "Unclean hands......is a figurative description of a class of suitors to whom a court of equity as a court conscience will not even listen, because the conduct of such suitors is itself unconscionable": 10 Ruling Case Law, section 139, page 389.

Oppressive bargainers are outcasts in a court of equity. These plaintiffs were oppressive bargainers because they forced their employees to surrender their right to associate with their fellow employees for economic self-protection. The conduct of these plaintiffs is comparable to that of an avaricious money lender who forces a hungry man to agree to pay usury for food money. There was no "freedom of contract" in this case between employer and employee, but only a colorable pretence of such freedom and "the law is not to be hoodwinked by colorable pretences; it looks at truth and reality through whatever guise it may assume": SHAW, C. J., in Com. v. Hunt et al., 45 Mass. 111. As Lord NORTHINGTON said in Vernon v. Bethel, 2 Eden 110, 112: "Necessitous men are not, truly speaking, free men; but, to answer a pressing exigency, will submit to any terms that the crafty may impose upon them."

I cannot agree with the court's fifth finding of fact that "there was no fraud or duress of any kind practiced by the Kraemer Hosiery Company to induce the employees to sign." No more potent duress can be applied to a wage-earner than to threaten him with the loss of his job. When millions of men are out of work, the loss of his job means to the wage-earner a threat of starvation for himself, his wife and children. It often means the sacrifice of a home which he has acquired by years of labor and frugality. It means inability to properly clothe and educate his family. Even in prosperous times the threat of losing a job is a powerful compulsion. To a man who resides in a small town the loss of his job means that he must separate himself from his home and his friends and seek sustenance among strangers. When most labor was unskilled, the loss of a job was not a serious matter for a new one was usually at hand. In these days of specialization, the loss of a job is to a wage-earner a calamity. A husband and father who is threatened with idleness unless he signs an agreement not to join a union has about as much "freedom of con-

tract" as has a shipwrecked sailor who is bartering for a seat in the only life boat in sight.

In the case of Coppage v. Kansas, 236 U. S. 1, Mr. Justice DAY, in an able dissenting opinion in which Mr. Justice HUGHES concurred, said, of this form of anti-union individual contract, that it was "essentially coercive. No form of words can strip it of its true character ...... Wherein is the right of the employer to insert this stipulation in the agreement any more sacred than his right to agree with another employer in the same trade to keep up prices? He may think it quite as essential to his 'financial independence' and so in truth it may be if he alone is to be considered...... It would be difficult to select any subject more intimately related to good order and the security of the community than that under consideration—whether one takes the view that labor organizations are advantageous or the reverse." Mr. Justice HOLMES dissented also, declaring that "liberty of contract begins in equality of position between the parties."

To judicially forbid any person from inducing "by any means whatsoever" the necessitous party to an anti-union contract to break it is an anomaly in a land where freedom of speech is a constitutional guaranty. Our own state Constitution, article I, section 7, declares that "the free communication of thoughts and opinions is one of the invaluable rights of man." If any of the defendants named in the injunctive decree appealed from should attempt "free communication of thoughts and opinions" by quoting the views herein expressed as to these anti-union individual contracts, he would find himself confronted with this injunction and subject to imprisonment for contempt of it.

It is contended that since the plaintiff had the "right," i. e., the power, to discharge any employee because that employee belonged to a labor union, it had the "right" to have that employee enter into an agreement not to join a labor union, and the employee having done so, the

employer acquired by virtue of that agreement a property right which equity should protect by injunction against any person who might by private counsel or public speech (i. e., "by any means whatsoever") induce the employee to believe that the contract was unconscionable and that its exactions should be ignored. It could with precisely similar logic be argued that since an employer has the "right," i. e., the power, to discharge an employee because that employee belonged to a church or a political party or was married, that the employer has the "right" to have that employee enter into an agreement with him not to join a church or political party, or not to marry, and that, upon such an agreement being entered into, the employer acquires by virtue of such agreement a property right which equity should protect by injunction against any person who might by private counsel or public speech (i. e., "by any means whatsoever") induce the employee to believe that the contract was unconscionable and that its exactions should be ignored.

My second proposition is that the lack of mutuality in this contract makes it in law a nullity.

The Court of Appeals of New York in Exchange Bakery & Restaurant, Inc., v. Rifkin, 245 N. Y. 260, 157 N. E. 130, held that contracts of this character were void. In that case the court said:

"Each waitress signed a paper stating that it was the understanding that she was not a member of any union, pledging herself not to join one, or, if she did, to withdraw from her employment. She further promised to make no efforts to unionize the restaurant, and says that she would attempt to adjust by individual bargaining any dispute that may arise. This paper was not a contract. It was merely a promise based upon no consideration on the part of the plaintiff."

I do not agree with the first conclusion of law of the court below that "the individual contract entered into between the Kraemer Hosiery Company and each of its

employees, was a working agreement which conferred valuable rights on each party to it, and there is nothing unlawful or illegal either in the terms of the contract or in the execution of the same." This contract *deprives* the employee of a most valuable right, to wit: the right to coöperate with his fellowmen in a labor union. It confers no rights upon him whatsoever; his job he had before the contract; his wages he had to earn.

My third proposition is that this anti-union contract is so at war with the public welfare as to disentitle it to legal recognition.

"There are many things which......are so mischievous in their nature and tendency that on grounds of public policy they are not permitted to be the subject of an enforceable agreement": 13 Corpus Juris, section 362, page 427.

"A contract contrary to public policy is void": Barton v. Benson, 126 Pa. 431.

A person's freedom to join a labor union or any other lawful organization cannot be bartered away by any contract for the protection of which a court of conscience should ever show any solicitude. We all have only that freedom of contract which the law gives us. The law denies all freedom of contract to some persons; it restricts freedom of contract in all persons. Only those contracts have legal vitality which make for the public good and which presumably will promote the interests of both parties. For example, usurious contracts are interdicted in order to protect borrowers.

Dean Roscoe Pound, in "Liberty of Contract," 18 Yale Law Journal, 454, says (page 482) : "Equity has interfered with contracts in the interest of weak, necessitous or unfortunate promisors. ...... Equity interfered to set aside contracts of sailors for the disposition of their wages or of prize money due them where these contracts appeared unfair, one-sided or inequitable. ...... It refuses to grant specific performance of hard bargains. ...... Courts of equity have not suffered jural notions

of equality to blind them to the facts of human intercourse." He refers to "the natural invalidity of a contract to become a slave or to a condition approximating slavery." He quotes Mill on "Liberty" to the effect that persons are not held to engagements which violate the rights of third parties. Dean Pound also declares that for a "weak and necessitous" person to have "freedom to impose a substantial restraint upon his liberty defeats the very end of liberty."

Chief Judge CARDOZO, in Harvard Law Review for March, 1931, (volume 44, page 687), wrote: "Many an appeal to freedom is the masquerade of privilege or inequality seeking to intrench itself behind the catchword of a principle."

Judicial recognition of these anti-union contracts is as much out of step with progress as was the decision of an American court in 1806 that a combination of workmen to raise wages was unlawful, or as was a similar decree of an English court in The King v. Journeymen Tailors, 8 Mod. 10. Labor unions have now won general acceptance as social forces making for human welfare and leaders of American thought have for thirty years borne witness to their usefulness in securing better hours, better conditions and better wages for the worker.

These essentially coercive anti-union contracts are socially wrong and legally indefensible. They are a vestige of economic bourbonism—a cult that is now outmoded. The social philosophy of industrial absolutism is, I believe, headed for as complete rejection in this country as was the social philosophy of the Dred Scott decision in 1856. Those employers who frankly recognize the right of employees to unite and to make their united voices heard in matters affecting the conditions of their employment are, according to my view, not only in harmony with the spirit of the age but are showing farsighted self-interest, for reactionism always begets radicalism.

These anti-union contracts contravene sound public policy for the further reason that they are provocative of violence. Millions of people in the United States, both within and without labor unions, detest these contracts as illegitimate weapons in contests between capital and labor. The very name by which these contracts are commonly known, to wit, "yellow dog contracts," indicates the public appraisal of them. Yet, according to the decree before us, these contracts are so sacrosanct that equity should shield them even from public discussion.

These anti-union contracts are not regarded by employers as contracts whose breach gives rise to actions at law. There is no record of any employer ever suing an employee for violating them. This anti-union contract has never served any purpose except as an emplacement for equity's longest range injunction gun. It is a verbal contrivance to inveigle a court of equity into an alliance with the opponents of labor unions in the battle of ideas between unionism and nonunionism. In a battle of ideas the agencies of government should always be neutral. Ideas should be fought out in a fair field. Truth is the best antidote for error. When either party in a battle of ideas attempts to usurp the functions of government by using force against the opposing party's person or property, a court of equity should vigorously launch its decrees against such lawlessness and usurpation. But here there was no force used or threatened by any of the defendants. As the court below found, "there was no disorder or breaches of the peace......and the element of violence......was inconsequential."

The court might also have added that there could not even be a breach of the anti-union contract unless the employee both joined the union *and* failed to withdraw from plaintiffs' employment. The activities of the appellant were not directed to securing breaches of these anti-union contracts, for the workers themselves would have been penalized for such breaches by having their

jobs taken away from them; appellant's activities were directed to the creation of a public sentiment favorable to labor unionism and hostile to these coercive restrictions on labor's right to organize—a sentiment which might easily have led the plaintiff company to join the ranks of those enlightened employers who have thrown these individual contracts onto the junk pile of obsolete anti-union weapons. This purpose of the appellant was an entirely lawful one, and the methods used by him have been lawful and in good repute in this country since 1776.

Enjoining violence and intimidation is one thing; enjoining individuals from peacefully urging by speech or writing, workingmen to organize is quite another thing. No judge has a right to proscribe free speech by a particular individual simply because he disapproves of the ideas which that individual expresses.

If in the case before us the individual contract had been *pro*-union instead of *anti*-union, how absurd it would appear if the plaintiffs had secured from the court an injunction restraining opponents of unionism from inducing "by any means whatsoever" the employees to break the contract and get out of the union. Yet the plaintiffs would have as much right to ask for that decree as to ask for the one they got. The broad phrase "by any means whatsoever" includes lawful discussion. What would a court of equity say about a contract that a labor organization might force an employer to sign that he would not unite with other employers? Would it enjoin citizens from advising the coerced employer that the contract he signed supported no legal right?

The mere fact that the defendants' advice might have induced plaintiffs' employees to quit their job with resulting pecuniary loss to the plaintiffs affords no basis for an injunction. If another hosiery manufacturer had located in Nazareth, Pa., and by better wages and working conditions had allured to his plant the employees of the plaintiff, a pecuniary loss would have had to be

borne by the latter as one of the incidents of commercial struggle.

If men can be enjoined by courts of equity from counselling others to change their status as members or non-members of any labor, political or other organization, because these others have agreed (willingly or unwillingly) not to do so, courts of equity are entering into a precarious field. History proves that "the existing order" is never in so much danger of losing support as when large masses of men deeply feel that its legal agencies are the instruments of oppression.

The court below based its decree on the decision of the United States Supreme Court in Hitchman Coal & Coke Co. v. John Mitchell, William Green, et al., of the United Mine Workers of America, reported in 245 U. S. 229. The decree of the court below and the appellees' paper book quote at great length from that opinion. The decision of the United States Supreme Court (HOLMES, BRANDEIS and CLARKE dissenting) on the questions decided in that case, while entitled to great respect, is not binding on this court, and further in the later case of American Steel Foundries v. Tri-City Council, 257 U. S. 184, in an opinion by Chief Justice TAFT, the Supreme Court interpreted the opinion in the Hitchman Case, and in substantial effect qualified it by saying (on page 211) : "The plan thus projected [in the Hitchman Case] was carried out in the case of the complainant company by the use of deception and misrepresentation with its non-union employees. ...... The unlawful and deceitful means used were quite enough to sustain the decision of the court without more."

Chief Justice TAFT also said in effect that the plan in the Hitchman Case involved a formidable country-wide and dangerous control of interstate commerce. The facts in the case now before us are, as Chief Justice TAFT said they were in the Foundries Case, such that "the circumstances of the [Hitchman] Case make it no authority for the contention here."

In the Foundries Case Chief Justice TAFT asked: "Is interference by a labor organization by persuasion and appeal to induce a strike against low wages under such circumstances without lawful excuse and malicious?" He answered: "We think not."

The case of Flaccus v. Smith, 199 Pa. 128, decided in 1901, is also relied upon by the appellees. The facts of that case differ from the facts before us. First, there is no evidence appearing in the record of that case that the signing of the anti-union contract was secured by economic or other duress. Second, there was a special consideration for the contract as the employees were all indentured apprentices and the employer agreed to teach them "the art, mystery, occupation and labor of glass blowing."

But as far as the Flaccus Case may be authority for bringing anti-union individual contracts within equity's protection, I would overrule it. Appellate courts expressly overrule or modify their former decisions when justice requires it. See Hall v. D., L. & W. R. R. Co., 270 Pa. 468; Farmers Loan & Trust Co. v. Minnesota, 280 U. S. 204; and Lonergan's Est., 303 Pa. 142, 148. The Flaccus Case was decided thirty years ago when these anti-union contracts were first making their appearance and when their anti-social ends were little understood.

Precedents should not be permitted to block the path of progress. Law is an attempt to solve social problems and therefore courts should frankly recognize and take into account the new and enduring social facts that are evolved in the seething crucible of human existence. Legal concepts must be harmonized with these facts if law is to serve life.

Justice OLIVER WENDELL HOLMES, in his "Path of the Law," 10 Harvard Law Review 466, said:

"We do not realize how large a part of our law is open to reconsideration upon a slight change in the habit of the public mind."

Theodore Roosevelt in his message to Congress, December 8, 1908, 43 Cong. Rec., part 1, page 21, said:

"For the peaceful progress of our country during the 20th century we shall owe most to those judges who hold to a 20th century economic and social philosophy and not to a long outgrown philosophy which was itself the product of primitive economic conditions."

My fourth proposition is that the suppression of the defendants' right of free discussion cannot be based upon contracts of others. In the appellees' paper book appears the following statement: "Even assuming that the individual contract termed the 'Yellow Dog' contract was obtained by duress, and further assuming that it is against public policy, we contend that in this action no advantage can be taken of these facts, since none of the employees who signed the contract are parties to the action, and the general rule is well-established and laid down in 13 C. J. 508 as follows: 'The defense of illegality, although open to the parties and those claiming under them, cannot, as a general rule, be invoked by third persons.' The defendants in this action are third parties, entirely unrelated to the contract, and therefore they have no standing to invoke the illegality of the contract, whether it be illegal on account of having been obtained by duress, or whether the contract is illegal as against public policy." An examination of the cases cited in the footnote to this principle in 13 Corpus Juris discloses that it applies to cases not in the remotest degree analagous to the case before us. However, the sentence *un*quoted by appellees, though immediately following in Corpus Juris the sentence quoted, is most pertinent to the present case. It reads as follows: "This rule is of course subject to an exception, where it is attempted to assert rights based on the contract, where the illegality of the contract appears from plaintiff's own showing, or where the interests of the person asserting the invalidity are affected." Among the cases cited in the footnote to the second sentence of that paragraph in

13 Corpus Juris, section 458, page 508, is the case of Cumberland Tel. & Tel. Co. v. City of Evansville, 127 Fed. 187, in which it is held: "A contract which is illegal, as contrary to public policy, is absolutely void, and may be attacked by any one and in any proceeding in which it is sought to found rights thereon." In the instant case plaintiffs are attempting to assert rights based on a contract where the illegality of the contract appears from plaintiffs' own showing, and where the interests of the person asserting the invalidity are affected. The defendants are being enjoined from exercising fundamental rights on the theory that the plaintiffs had "property rights" in the contract invoked and harm to this "property" might result from defendants' discussions. The law should no more recognize these anti-union contracts than it recognizes "white slave" contracts. Both contracts are at war with public welfare. If a union organizer cannot go to Nazareth, Pa., and by speech and writing endeavor to create public opinion favorable to unionism because an employer of 241 workmen in that town has a property right in an anti-union individual contract signed by those workmen, it follows that a union organizer cannot go to Philadelphia or any other large city and endeavor to create sentiment favorable to unionism if an employer of a few workmen in that city has a property right in an anti-union contract signed by those employees. It follows also that a mother could not, without running the risk of being enjoined by a court of equity, advise an affianced daughter that her contract to marry was undesirable and improvident. The other contracting party might contend that he had a property right in that contract, and that his prospective mother-in-law should be enjoined from any attempted interference with it. Employers of labor have no peculiarly sacred rights in their contracts with employees and courts of equity cannot in order to protect such contracts infringe on the constitutional rights of others.

The concurring opinion states that "Budenz, the sole appellant, resident in the State of New Jersey, and here only during the time of this trouble, was a third party not entitled to take advantage of the invalidity of the individual contract even if it had existed." The fact that Budenz resided in New Jersey does not abridge in the slightest degree his right to freedom of speech in Pennsylvania, any more than does the fact that Horace A. MacDonald is a resident of the State of New York abridge his right to furnish individual contract forms to the Kraemer Hosiery Company.

My conclusion is that the decree of the court below should be completely reversed. Inasmuch as Budenz did not use threats or intimidation and did not send libelous and scandalous letters, pamphlets or newspapers to anybody, and committed no unlawful act whatsoever, there is no more reason why an injunction should be issued against him restraining him from doing things which he never did or threatened to do than there would be for issuing such an injunction against any other unoffending citizen. To enjoin Budenz from threats and intimidation—as the majority opinion does—is in effect saying that what Budenz did in this case amounted to the use of threats and intimidation. I have searched the record in vain to find the name of a single individual whom Budenz attempted to threaten or intimidate.

Neither do I find in any of the pamphlets or newspapers put in evidence by the appellee any libelous or scandalous matter written or published by Budenz. For the courts to say to a man, "You may have freedom of speech, but you cannot say anything that *we* consider scandalous or libelous," is in my opinion the attempted exercise of an arbitrary power which has never been placed in the courts of this State or nation. If Budenz cannot say, write or publish anything which might result in the Kraemer employees while still in the company's employ becoming members of the American Federation of Full Fashioned Hosiery Workers, then any

speech by whomsoever made or any newspaper by whomsoever published which might have the same result is equally subject to injunction. For example, any person going to Northampton County and quoting the statement of Justice DAY of the United States Supreme Court in his dissenting opinion in Coppage v. Kansas, supra, which dissenting opinion was concurred in by Justice (now Chief Justice) HUGHES, that these anti-union contracts are "essentially coercive," would, if treated as Budenz has been treated here, find himself silenced by an injunction and in jail if he broke that silence. Surely, Budenz has the same right to say and publish the things he said and published as have the most eminent citizens of the land.

Nor can I find anywhere in the record any warrant for this court's restraining Budenz from picketing plaintiffs' plant. The decree of the court below does not even mention picketing. Apparently, the picketing charged in this court's opinion and in the concurring opinion is picketing by appearing at the gates of the Kraemer plant and distributing the pamphlets known as "The Nazareth Hosiery Worker" to the employees. This is not picketing. The very essence of picketing is the attempt to induce employees to strike. The court below completely exculpates the appellant, Budenz, from this charge, saying in his fourth finding of fact: "There is no evidence that Mr. Budenz counseled any of the employees of the Kraemer Hosiery Company to strike in the present controversy." The majority opinion refers to "picketing brought about by the printed matter issued by defendants." The concurring opinion says that "Budenz,..... in addition to writing these articles and publishing and circulating generally the newspaper in which they were published,......personally appeared at the gates of the plant and distributed them to the employees as they left the plant." I hold that if Budenz distributed these pamphlets to the employees as they left the plant he did only what he had a perfectly lawful right to do, but ac-

cording to the opinion and decree of the court below he did not even do that much. The court below said: "The first of these pamphlets was distributed by hand and from house to house, Mr. Budenz taking part in the distribution, but after the passage of an ordinance, prohibiting the distribution of printed matter within the Borough of Nazareth without a permit being obtained from the chief burgess, and license fee paid, on September 3, 1929, the last three issues were sent through the United States mail." If this constitutes "picketing," it is certainly lawful picketing. Picketing, i. e., persuasion of workmen to strike, is not unlawful unless it is accompanied by threats or abuse. This court held in 1894 in Cote v. Murphy et al., 159 Pa. 420, that the right of workmen to quit work and "by all lawful means, such as reasoning and persuasion," to "prevent other workmen from working for less" was "clear."

The right to persuade others to strike received impressive judicial recognition in the case of American Foundries v. Tri-City Council, already cited in this opinion, where the Supreme Court of the United States held that an injunction against persons who induced by lawful and peaceful persuasion employees to refuse to accept reduced wages and to quit their employment, was improper.

It appears to me that what the court below enjoined as to Budenz and what the majority of this court is now enjoining is Budenz's right of free speech. When Budenz was on the stand in this case he was asked if he had written in the Nazareth Hosiery Worker a statement that the [individual] contract is against the basic idea of Americanism, that men and women should be free to have such political and economic beliefs as they wish to have. He answered, "Yes." He was then asked, "Is that your conviction?" He answered, "Absolutely." He was then asked, "Upon what is that conviction based?" He answered, "Upon my understanding of the whole principle and philosophy on which this Republic stands,

which is contained in the real American idea of democracy, freedom of speech, press and assemblage, freedom of one man to do and join that which he wishes, provided he commits no unlawful act." I uphold Budenz in his assertion of his right to freedom of speech, press and assemblage as he exercised that right, for I find nowhere in the record any evidence that in the exercise of that right he committed any unlawful act. The court below declared, as we have already noted, that there was no disorder or breaches of the peace at any of the meetings which Budenz addressed.

If this court means to hold—as I understand its decision in this case to hold—that because there might have resulted from Budenz's speeches and writings a violation of the individual anti-union contract these speeches and writings should be enjoined, I cannot follow this court to that extreme position. I could not do so even if I considered the individual contract legal, instead of utterly illegal and void, as I do hold it. To enjoin the dissemination of ideas because they may result in a breach of some contract is to my mind a doctrine both novel and utterly impracticable in application. If this is the law, a manufacturer of automobiles or of any other product who advertises his product as superior would be subject to injunction at the instance of a competing manufacturer, because some person who had contracted to buy the latter's product might as a result of that advertising breach his contract. By the same legal logic, anyone publicly proclaiming the wisdom of an exclusively vegetarian diet would be subject to an injunction at the instance of any meat dealer whose contract to supply meat to a customer might be breached upon that customer's conversion to vegetarianism. Furthermore, as I have already pointed out, the individual contract in this case would not be breached unless the employee *both* joined the union *and* remained in plaintiffs' employ, and plaintiffs could prevent this breach simply by dismissing the employee.

What plaintiffs sought to and did restrain by injunction was nothing more or less than Budenz's public advocacy of trades-unionism because eventually this advocacy might result in the growth of trades-union sentiment in and about plaintiffs' plant, and this might lead to the unionization of the plant, with higher wages and shorter hours for the employees and some possible diminution of the employer's profits. An injunction against this public advocacy is to my mind insupportable. I think Budenz's right to say and publish what he did and to do what he did is embedded in the fundamental law of both the State and the nation. The decree appealed from is in effect an injunction against Budenz's ideas, not against his acts, for not a single unlawful act did or could the court below find against him. That decree should therefore be entirely reversed and set aside, for ideas are not subject to injunction. Ideas have far reaching effects. Some of these effects may be good and some may be evil, but it is opposed to progress and contrary to the spirit of our institutions to entrust any official with the arbitrary power to say what ideas shall be liberated and what ideas shall be suppressed. As Justice HOLMES said in his dissenting opinion in Gitlow v. New York, 268 U. S. 652, 673: "Every idea is an incitement. It offers itself for belief and if believed it is acted on unless some other belief outweighs it or some failure of energy stifles the movement at its birth."  .

The decree appealed from not only contravenes our fundamental law, but it also is opposed to social progress and out of harmony with the general will. Hallis, in his recently published work on "Corporate Personality" (pages 242 and 243) profoundly observes: "Law is not static. It is in its nature evolutionary and dynamic, for it has its foundation in the evolutionary and dynamic process of social history. It is born of a struggle for right which is the real scene of all legal formation, and it is, therefore, in the adjustment of competing claims that its true function lies. Law is conditioned by the ac-

tual nature of the wills which impel the social machine as well as by the normative demands of juristic idealism. Whereas it always has a moral background because it is always an attempt at just law, it is also an empirical phenomenon, because it derives its sanction from those whom it governs."