Locust Club, Appellant, *v.* Hotel and Club Employees' Union.

Argued May 5, 1959.   Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN and McBRIDE, JJ.

*Robert H. Kleeb,* with him *Kenneth Souser,* and *Morgan, Lewis & Bockius,* for appellant.

*Edward Davis,* for appellees.

OPINION BY MR. JUSTICE McBRIDE, October 21, 1959:

The Locust Club is a Pennsylvania non-profit corporation organized and operated for the purpose of maintaining a clubhouse and for the promotion of friendship and good citizenship. It operates a bar and restaurant for the pleasure and accommodation of its approximately 300 members and the use thereof by

non-member guests is merely incidental. It is not engaged in any industry, commerce, or business separate and apart from the maintenance of the club. The Union is an unincorporated labor organization, its membership being composed in part of cooks, waiters, bartenders, waitresses, bus help, dishwashers, bell men and linen room attendants, i.e., the same job classifications as those of the persons employed by the club. It represents as bargaining agent such employees of 31 hotels and 2 clubs which are similar to the Locust Club. Lawrence Stoltz is the President and Business Manager of the Union.

In August, 1956, the Union made a demand upon the club for recognition as collective bargaining agent of the club's employees claiming to represent the majority thereof. The club refused. Thereupon the Union, on or about October 18, 1956, caused some employees of the club to strike and has since that time caused the clubhouse to be picketed by varying numbers of persons. It was stipulated that at the time the strike was called and the picketing commenced, the Union represented 12 of a total of 19 employees of the club such as would have constituted an appropriate bargaining unit; that 10 of the 19 employees never participated in the strike; that the 9 employees who did participate in the strike have all been replaced by the club. The various legends of the picket signs have indicated that a strike was in progress, that the club's employees are not members of the union, and also contained the statement "Union requests your cooperation".

The request of the club for a preliminary injunction restraining the picketing was refused by Judge GRIFFITHS, the chancellor, and although the club took an appeal it was later withdrawn. Stipulations of fact were entered into and the matter was decided by the

chancellor on final hearing. The chancellor filed an adjudication denying injunctive relief and dismissed the complaint. On exceptions his findings were sustained by the court en banc, consisting of GRIFFITHS and CHUDOFF, JJ. President Judge HAGAN dissented.

It is conceded by both parties that the questions before this Court are purely legal since the essential facts are not in dispute. Those questions are twofold: (1) Does the Labor Anti-Injunction Act[1] apply so as to oust the jurisdiction of the court below to grant an injunction? and (2) Assuming it does not apply, was it error under the circumstances of this case to refuse an injunction?

The legislature has ordained in the Labor Anti-Injunction Act that the courts of Pennsylvania are without jurisdiction to grant a temporary or permanent injunction "contrary to the public policy declared in this act" or "in a case included within this act". 43 P.S. §206d. The Act stated the public policy of the Commonwealth to be that ". . . the individual unorganized worker is commonly helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment, wherefore, though he should be free to decline to associate with his fellows, it is necessary that he have full freedom of association, self-organization, and designation of representatives of his own choosing to negotiate the terms and conditions of his employment . . ."

A "case included within this act" is one which grows out of a "labor dispute" as defined therein. A "labor dispute", as stated in 206c(a) (b) and (c), exists where "the case involves persons who are engaged

---

[1] Act of June 2, 1937, P. L. 1198, 43 P.S. §206a, et seq., as amended.

in a single industry, trade, craft or occupation, or have direct or indirect interests therein," *or* concerns "the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment or concerning employment relations or any other controversy arising out of the respective interests of employer and employee. . ."[2]

---

[2] The exact language is as follows:

"(a) A case shall be held to involve or to grow out of a labor dispute when the case involves persons who are engaged in a single industry, trade, craft or occupation, or have direct or indirect interests therein, or who are employes of the same employer, or who are members of the same or an affiliated organization of employers or employes, whether such dispute is—(1) between one or more employers or association of employers, and one or more employes or associations of employes; (2) between one or more employers or associations of employers, and one or more employers or associations of employers; or (3) between one or more employes or association of employes, and one or more employes or association of employes; or when the case involves any conflicting or competing interests in a 'labor dispute' (as hereinafter defined) of 'persons participating or interested' therein (as hereinafter defined.)

"(b) A person or association shall be held to be a person participating or interested in a labor dispute if relief is sought against him or it, and if he or it is engaged in the same industry, craft or occupation in which such dispute occurs or has a direct or indirect interest therein, or is a member, officer or agent of any association composed in whole, or in part, of employers or employes engaged in such industry, trade, craft or occupation.

"(c) The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment or concerning employment relations or any other controversy arising out of the respective interests of employer and employe, regardless of whether or not the disputants stand in the proximate relation of employer and employe, and regardless of whether or not the employes are on strike with the employer."

The word "employer" includes a corporation not for profit.[3] The term "employe" includes all natural persons who perform service for other persons.[4]

We have held in *Pennsylvania Labor Relations Board v. Overbrook Golf Club,* 385 Pa. 358, 123 A. 2d 698, that a club is not an employer within the meaning of the Pennsylvania Labor Relations Act[5] and hence may not be compelled by the Labor Relations Board to recognize the union or to engage in a collective bargaining agreement with it. That, however, does not mean that the club is *prohibited* from doing so unless that would be unlawful or constitute an unfair labor practice. It does not follow that the club is not covered by the provisions of the Labor Anti-Injunction Act. That point was not involved in the *Overbrook* case.

Both acts were passed at the same session of the legislature. Nevertheless, we may not overlook obvious differences in language, particularly in the coverage section; all provisions of each statute must be read so as to effectuate the intention of the legislature.

---

[3] "(g) The term 'employer' is declared to include master, and shall also include natural persons, partnerships, unincorporated associations, joint-stock companies, corporations for profit, corporations not for profit, receivers in equity, and trustees or receivers in bankruptcy."

[4] "(h) The term 'employe' is declared to include all natural persons who perform services for other persons, and shall not be limited to the employes of a particular employer, and shall include any individual who has ceased work as a consequence of or in connection with, any matter involved in a labor dispute."

[5] The term "employer", in Section 3(c) of the Pennsylvania Labor Relations Act, 43 P.S. §211.3(c), is as follows:

"The term 'employer' includes any person acting, directly or indirectly, in the interest of an employer, but shall not include the United States or the Commonwealth, or any political subdivision thereof, or any municipal authority, or any person subject to the Federal Railway Labor Act or any labor organization (other than when acting as an employer), or anyone acting in the capacity of officer or agent of such labor organization."

We are obliged to hold that since the word "employer" in Section 206c of the Pennsylvania Anti-Injunction Act specifically includes *corporations not for profit* the Locust Club is an employer within the meaning of that act. It remains to inquire, therefore, whether the present case is a labor dispute as that term is used in the Labor Anti-Injunction Act.

The court below, on sufficient evidence, found as follows: "The employees of the Club are in direct competition with the employees doing similar work at hotels and restaurants affecting the labor market and the plaintiff is engaged in the respective trades and occupations of its employees so engaged."

In respect of the club the chancellor stated, in the adjudication: ". . . It operates a barber shop in competition with outside shops for the trade of its members. It also operates a restaurant in competition with other restaurants and hotels for the trade of its members for lunches and dinners. No doubt many of its members partake of their downtown, weekday lunches almost exclusively at the club to the loss of such business by other downtown city hostelries. The fact that the restaurant is operated at a loss does not gainsay the simple truth that the club is in the business of selling meals to its members. Many business houses have at times operated at a loss, but such a fact does not, as a chameleon, change the nature of its business by the color of the ink used in its final entry on the balance sheet. Furthermore dues of members are intended to implement such facilities afforded the membership.

"We believe the plaintiff is in as much a trade or occupation as any other restaurant or barber shop. . . ."

The court held, therefore, that it lacked the power to grant an injunction because of the provisions of the Labor Anti-Injunction Act.

The club relies upon *Western Pennsylvania Hospital et al. v. Lichliter et al.,* 340 Pa. 382, 17 A. 2d 206, in which we held that neither the Labor Relations Act nor the Labor Anti-Injunction Act applied to such a hospital. Here, however, it is obvious that the operation of a club, such as the present one, is different from the operation of a hospital so far as concerns the effect of the Labor Anti-Injunction Act. The court below has pointed out the ways in which the activities of this club, with its bar, barbershop and restaurant, partakes of the nature of any other restaurant or hotel except that overnight accommodations are not provided. The fact that its clientele is limited to its membership constitutes a difference in degree and not in kind. The controlling feature is that the employees of the non-profit club perform the identical wage-earning duties performed by other employees in profit-making establishments such as hotels and restaurants and thus are engaged in an occupation which gives both an interest in their mutual wages or working conditions. To analogize the operation of this social club to the operation of a charitable hospital, which deals with the health and indeed the life of the general community, would be to prefer shadow to substance.

The relief sought in the present case is against the Union and through it against its membership. Thus this is a controversy arising out of the respective interests of employer and employee and is by definition a "labor dispute" within the meaning of that term in the Labor Anti-Injunction Act. The Act was a procedural statute designed to protect workmen. The Labor Relations Act was primarily intended to deal with labor disputes by an administrative agency; the Labor Anti-Injunction Act was a specific limitation upon the power of courts. That the two are related do not make them necessarily coextensive.

It remains to consider the point raised by the club, that although the union at the time of the strike represented a majority of the employees, it did not do so at the time this suit was instituted.[6] The chancellor, while recognizing that the Locust Club could not be prevented from replacing the striking employees by administrative or legal procedures, held that this condition should not be permitted to frustrate the legitimate purpose of the union, which at the time of the strike had a majority and did not lose it by the non-redressable unilateral act of the club in replacing those employees. To hold otherwise would obviously defeat the public policy of the act. In *Anchorage, Inc. v. Waiters & Waitresses Union*, 383 Pa. 547, 119 A. 2d 199, we found that the evidence which justified the court in making a distinction between conduct which may have been lawful in its inception but became unlawful through persistence long after it became clear that the lawful object could not be obtained, has no application here where the changed status has been brought about not by virtue of any act on the part of the union but by the ex parte act of the club, whether lawful or not. In other words, here the club is seeking to take advantage of a change in the status quo created by itself. The court below was fully justified in holding that it would not give controlling influence to such a position. It is not even contended by appellant that this was an organizational strike. Clearly its purpose

----

[6] The Labor Anti-Injunction Act does not apply: "Where a majority of the employes have not joined a labor organization, or where two or more labor organizations are competing for membership of the employes, and any labor organization or any of its officers, agents, representatives, employes, or members engages in a course of conduct intended or calculated to coerce an employer to compel or require his employes to prefer or become members of or otherwise join any labor organization." 43 P.S. §206d(b).

was not to gain new members either by lawfully persuading the employees to join or unlawfully coercing the employer to require the employees to do so.

It is clear that the present case is "included within" the Labor Anti-Injunction Act and that to grant the injunction would also "violate the public policy declared by the Act".[7] The court below was correct in holding itself to be without jurisdiction in this case.

Even if the Labor Anti-Injunction Act were not applicable we would still necessarily affirm the court below.

Courts of equity, under the Act of June 16, 1836, P. L. 784, §13, 17 P.S. 281, 282, and the Act of Feb-

---

[7] The Act specifically denies jurisdiction to enjoin.

"(e)   Giving publicity to, and obtaining or communicating information regarding the existence of, or the facts or merits involved in, any labor dispute, whether by advertising, speaking or picketing or patrolling any public street or place where any person or persons may lawfully be, or by any other method not involving misrepresentation, fraud, duress, violence, breach of the peace or threat thereof. (f) Organizing themselves, forming, joining or assisting in labor organizations bargaining collectively with an employer by representatives freely chosen and controlled by themselves, or for the purpose of collective bargaining or other mutual aid or protection, or engaging in any concerted activities. (g) Persuading by any lawful means other persons to cease patronizing or contracting with or employing or leaving the employ of any person or persons. (h) Ceasing or refusing to work with any person or group of persons. (i) Ceasing or refusing to work on any goods, materials, machines or other commodities. (j) Assembling peaceably to do, or to organize to do, any of the acts heretofore specified, or to promote their lawful interests. (k) Advising or notifying any person or persons of an intention to do or not to do any of the acts heretofore specified. (l) Agreeing with other persons to do or not to do any of the acts heretofore specified. (m) Advising, urging or otherwise causing or inducing, without misrepresentation, fraud or violence, others to do or not to do the acts heretofore specified; and" 43 P.S. §136, §206f (e) (f) (g)-(h) (i) (j) (k) (l) (m)

ruary 14, 1857, P. L. 39, §1, 17 P.S. 283, have had and continue to have jurisdiction to grant or refuse to grant injunctive relief even in labor disputes except where such jurisdiction has been withdrawn. See *Main Cleaner & Dyers, Inc. v. Columbia Super Cleaners, Inc. et al.*, 332 Pa. 71, 75, 2 A. 2d 750; *Bright v. Pittsburgh Musical Society, American Federation of Musicians, Local 60*, 379 Pa. 335, 108 A. 2d 810.

It must be remembered that we are not reviewing here a case where the court below *granted* an injunction; we are, instead, reviewing a case where the lower court *refused* to do so. Therefore, it does not necessarily avail the club to demonstrate that neither the Labor Relations Act nor the Labor Anti-Injunction Act is applicable. All that would follow would be that the court below was possessed of its reviewable discretionary power to grant or refuse the requested equitable relief under the circumstances of the individual case.

The chancellor here found that the picketing was constitutionally protected and within the public policy of the Commonwealth. Upon this finding he predicated his refusal to enjoin it.

It is well settled that the basic findings of the chancellor, supported by the record and affirmed by the court en banc, will not be disturbed on appeal. *DeJoseph v. Zambelli*, 392 Pa. 24, 139 A. 2d 644; *Howarth v. Miller*, 382 Pa. 419, 115 A. 2d 222. It is likewise settled law that an injunction will not issue in the absence of a clear right thereto. *McDonald v. Noga*, 393 Pa. 309, 312, 141 A. 2d 842. Chancery never puts forth this strong arm of injunction unless in a clear case of the invasion of a private or public right. *City of Philadelphia's Appeal*, 78 Pa. 33. The club, nevertheless, contends that we must reverse the court below because the conduct of the union was unlawful and should have been enjoined under the Act of 1836, *supra*.

It is true that in *International Brotherhood of Teamsters v. Vogt,* 354 U. S. 284, the Supreme Court of the United States ruled that a state has the power to decide its own public policy in the matter of picketing, subject only to the rule that it cannot enact blank prohibitions against all picketing per se.

By way of historical background it is interesting to note that at one time it was considered a criminal conspiracy for men to organize into unions. *Cote v. Murphy,* 159 Pa. 420, 425, 28 Atl. 190. However, in this State, it was declared by our Legislature many years ago that it was not criminal per se for employees to organize, Act of May 8, 1869, §1, P. L. 1260, 43 P.S. §191; or concertedly to refuse to work, Acts of June 14, 1872, §1, P. L. 1175, 43 P.S. §200, and June 16, 1891, P. L. 300, 43 P.S. §199.

While these Acts removed the stigma of a criminal sanction, they did not impose upon an employer the duty to bargain with any organized group of employees. This concept was not part of the law of Pennsylvania until the passage of the Pennsylvania Labor Relations Act in 1937, which was patterned after the National Labor Relations Act (Wagner Act) of 1935. Since the Pennsylvania Labor Relations Act is not applicable to the plaintiff (*Overbrook Golf Club,* supra) the plaintiff is free to refuse to bargain. This means only that there exists no remedy, administrative or otherwise, whereby the union can *compel* such recognition and bargaining. It does *not* mean that the union is thereby prevented from using lawful economic pressure to persuade the club to recognize and bargain, and the lower court has found, upon sufficient evidence, that that is precisely what occurred in this case.

All of this was determined by us in *Kirmse v. Adler,* 311 Pa. 78, 166 A. 566. That case substantially

answers all of the club's contentions. The primary aim of the Appellee Union here in picketing the Club was to achieve recognition for the Union as collective bargaining agent, and thereby improve and protect the wages, hours and working conditions of the Club's employees, while at the same time preserving the standards in other unionized establishments among hotels and clubs in the City of Philadelphia. The secondary purpose was, of course, to impose economic pressure upon the patronage of the Club, clearly a lawful act. As we said in *Kirmse*, at p. 86: ". . . *If one has a legal right to do a particular thing, the law will not inquire into his motive for doing it*: Beirne v. Continental Equitable, 307 Pa. 577. Having this unquestioned right to present their case . . . *in a peaceful way*, if the employer suffers loss from this peaceable assertion of rights, *it is a damage without a remedy.* The controlling factor must be, do the methods used involve intimidation or coercion in any form? *If they do not, but are peaceful and orderly, equity will not interfere.*" (Emphasis supplied.) In reversing an injunction we said, quoting from *Kraemer Hosiery Co. v. Amer. Fed. F. F. H. Workers*, 305 Pa. 206, 157 A. 588: "This much is secured to the citizen by the constitutional provision that: 'The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty.'"[8]

Although the activity engaged in by the Union in the *Kirmse* case did not specifically turn upon picketing, as such, the Court there said "Picketing, if peaceful and unaccompanied by coercion, duress, or intimidation, is lawful."

---

[8] Penna. Const., Art. I, §7 (1874).

The *Kirmse* case was decided by this Court prior to the passage of either the Labor Anti-Injunction Act or the Pennsylvania Labor Relations Act, and is still the law today, when the procedural Anti-Injunction Act is not controlling.

Peaceful picketing has been recognized as a form of assembly and of speech, and has been afforded the protection of Article I, Section 7 of the Constitution of Pennsylvania. In addition to *Kraemer Hosiery Co. v. Amer. Fed. F. F. H. Workers,* supra, and *Kirmse v. Adler,* supra, cited above, see: *American Brake Shoe Co. v. District Lodge 9 of the Int. Asso. of Machinists,* 373 Pa. 164, 173, 94 A. 2d 884; *Wortex Mills, Inc. v. Textile Workers Union of America, C.I.O.,* 369 Pa. 359, 85 A. 2d 851; *Alliance Auto Service v. Cohen,* 341 Pa. 283, 19 A. 2d 152.

It is true that picketing, even though peaceful, is not necessarily beyond the power of a court to enjoin and an injunction may issue wherever the picketing is for an unlawful object or is in violation of state law or public policy. However, the chancellor found that the picketing in this case did not have an unlawful object, was not forbidden by law and did not contravene public policy. That finding was in accordance with the evidence in the case and we uphold it. Therefore, we could not overrule the lower court in this case unless we were to enforce a blanket prohibition against all picketing on the ground that picketing, since it involves more than mere speech, is enjoinable per se. This we could not do even under the Fourteenth Amendment to the United States Constitution. *Thornhill v. Alabama,* 310 U. S. 88; *American Federation of Labor v. Swing,* 312 U. S. 321; and *Bakery and Pastry Drivers v. Wohl,* 315 U. S. 769, even when considered in the light of *Teamsters Union v. Vogt,* 354 U. S. 284, still stand in the way. But even if the Four-

teenth Amendment did not apply to the facts of this case, as found by the chancellor, we would still be enjoined from reversing by our own Constitution. It is only where public policy, whether enunciated by the court or legislature, or state law, contravene the Fourteenth Amendment that the decisions of the Supreme Court of the United States are controlling. Therefore, even were we *permitted* by the Fourteenth Amendment to reach a different result, we are not compelled to do so. We rest decision in this case upon our own Constitution, law and public policy.

It may be suggested that this economic warfare, without administrative agency to settle the problem, is undesirable but it is our function to interpret the law as we find it and not to usurp the legislative province. We have here a conflict between a club, which cannot lawfully be forced to recognize or bargain with the union, and a union which, lacking such legal procedures to compel the club to recognize and bargain with it, nevertheless has the right, so long as it does not resort to unlawful coercion, to attempt by all economic means in its power to persuade the club to do what it cannot otherwise compel it to do. There is here involved no question of peaceful picketing which constituted persuasion in the first instance but, having been too long and persistently continuous, becomes a nuisance and an unlawful form of coercion, as in *Jefferson & I. Coal Co. v. Marks,* 287 Pa. 171, 134 A. 430; nor, as in *Anchorage, Inc. v. Waiters & Waitresses Union,* 383 Pa. 547, 119 A. 2d 199, where there was involved organizational picketing persisted in for five years which the court below found could never succeed at all. Even so, in the *Anchorage* case, we were careful to point out that "It is, of course, true that picketing which is lawful does not necessarily become unlawful merely by the extended duration of time dur-

ing which it may be carried on . . ." The court below, in the present case, found on sufficient evidence that this picketing had not become unlawful. The court below in the *Anchorage* case found that it had.

It is not significant in the present case that all members of the union did not go out on strike. By remaining at their work they did not thereby cease to be members of the union. To hold that a club which employs persons in the categories in which the Locust Club does and that such employees may be restrained by a court from acting collectively, requires a very clear statutory differentiation between them and others which does not appear under the circumstances of the present case. An interpretation of law which would put persons similarly situated in a different category in respect of their equality before the law requires, at least, that the legislation which seeks to accomplish such purpose is free and clear of all doubt.

We conclude that the court below was without power under the Labor Anti-Injunction Act to restrain the lawful activity of the union as disclosed by this record and that in any event it was justified in refusing to impose the heavy hand of injunction under the circumstances of this case.

The decree of the court below is affirmed, costs on appellant.

Mr. Chief Justice JONES concurs in the result.

———

DISSENTING OPINION BY MR. JUSTICE BELL:

The Locust Club is a Pennsylvania non-profit corporation organized and operated for the purpose of maintaining a clubhouse to provide for the social enjoyment of its members and for the promotion of friendship and good citizenship. It operates a restau-

rant and bar for the pleasure and accommodation of its approximately 300 members, as well as for non-member guests whose use thereof is merely incidental. It is a *social* club and is not engaged in any industry or commerce, or in any business as that term is commonly understood.

The union has been picketing the Locust Club since October 1956 without gaining a single member. However, the picketing has harassed and oppressed the Club and its members and *many persons have refused to deliver food and essential supplies because of the picket line.* It is as obvious as anything can be that the real object of the picketing is to coerce the Club into requiring its employees to join the union—in violation of the Pennsylvania Labor Relations Act. We note parenthetically that such picketing even of an industrial corporation has been termed "blackmail picketing" by President Eisenhower in his recent nationwide radio address, and has been prohibited by Congress in the recent Labor-Management Act of 1959.

The lower Court refused injunctive relief because "We believe the Pennsylvania Anti-Injunction Act is applicable to plaintiff's business or trade and the court is therefore without power to issue an injunction prohibiting picketing for recognition purposes." The majority opinion states "The court below was correct in holding itself to be without jurisdiction in this case."

The unions argue that they have an absolute right (1) to peacefully picket for as many years as they desire, if *one* of their objectives is to organize the employees, or to compel recognition of the union, since such picketing is a form of free speech and is therefore absolute, boundless and unlimited; and (2) a fundamental right to injure or destroy, by picketing, the business of any employer whether the employer be engaged in industry or in business, or is a hospital, a

charity or a social club. The law does not support these alleged "picketing" rights. Since the aforesaid misconceptions are so deep-rooted and are not confined to union lawyers, we shall once again and, we hope forever, dispose of them.

Picketing is a form of freedom of speech, but as the Supreme Court of the United States has realistically said, picketing is much more than freedom of speech[*] and consequently it is neither actually nor legally the equivalent of free speech.[**]

There is no absolute unqualified unlimited right to picket. For example, picketing accompanied by intimidation, threats or violence, as well as mass picketing is illegal. Moreover, the recent decisions of the Supreme Court of the United States and of this Court hold that a State Court may enjoin peaceful picketing if it is conducted in an unlawful manner or for an unlawful purpose; peaceful picketing is lawful only if the method and means employed *and all* the objects and purposes of the picketing are lawful: *International Brotherhood of Teamsters v. Vogt, Inc.*, 354 U. S. 284 (1957); *Giboney v. Empire Storage & Ice Co.*, 336 U. S. 490; *Hughes v. Superior Court*, 339 U. S. 460; *Building Service Employees v. Gazzam*, 339 U. S. 532; *Teamsters Union v. Hanke*, 339 U. S. 470; *Plumbers Union v. Graham*, 345 U. S. 192; *Anchorage, Inc. v.*

---

[*] Realistically speaking, picketing is no longer a mere message and an appeal. It has become, by usage and custom, in many instances, an economic *club* to force an employer to choose one of two alternatives—(1) to recognize a union, or to coerce him to induce or compel his employees to join a union, or to agree to better wages, shorter hours, and better working conditions; or alternatively (2) to suffer great financial loss or ruin.

[**] Even free speech is not absolute and unlimited: See *Mack Appeal*, 386 Pa. 251, 256, 262, 126 A. 2d 679, and 20 cases cited therein.

*Waiters & Waitresses Union,* 383 Pa. 547, 119 A. 2d 199; *Sansom House Enterprises, Inc. v. Waiters & Waitresses Union,* 382 Pa. 476, 115 A. 2d 746; *Baderak v. Building Trades Council,* 380 Pa. 477, 112 A. 2d 170; *Grimaldi v. Local No. 9,* 397 Pa. 1, 153 A. 2d 214; *Phillips v. United Brotherhood of Carpenters & Joiners,* 362 Pa. 78, 66 A. 2d 227; *Wortex Mills v. Textile Workers,* 369 Pa. 359, 85 A. 2d 851; *Northampton Area Joint School Authority v. Building & Construction Trades Council,* 396 Pa. 565, 152 A. 2d 688; *West Penn Township School District v. International Brotherhood of Electrical Workers,* 394 Pa. 408, 145 A. 2d 258. However, if the picketing is peaceful *and in every way lawful,* the fact that it will cause an industrial employer financial damage is legally irrelevant: *Wortex Mills v. Textile Workers,* 369 Pa., supra; *Anchorage, Inc. v. Waiters & Waitresses Union,* 383 Pa., supra.

The most recent decision of the Supreme Court of the United States, after analyzing and reviewing prior decisions of the Court, cleared up any confusion which may have existed and clearly stated the law in *International Brotherhood of Teamsters v. Vogt, Inc.,* 354 U. S. 284 (1957). *The Court affirmed an injunction which restrained peaceful organization picketing,* and said (pages 285, 286, 289-294) :

"This is one more in the long series of cases in which this Court has been required to consider the limits imposed by the Fourteenth Amendment on the power of a State to enjoin picketing. . . . Respondent owns and operates a gravel pit in Oconomowoc, Wisconsin, where it employs 15 to 20 men. Petitioner unions sought unsuccessfully to induce some of respondent's employees to join the unions and commenced to picket the entrance to respondent's place of business with signs reading, 'The men on this job are not 100% affiliated

with the A.F.L.' 'In consequence,' drivers of several trucking companies refused to deliver and haul goods to and from respondent's plant, causing substantial damage to respondent. Respondent thereupon sought an injunction to restrain the picketing.

"The trial court did not make the finding, requested by respondent, 'That the picketing of plaintiff's premises has been engaged in for the purpose of coercing, intimidating and inducing the employer to force, compel, or induce its employees to become members of defendant labor organizations, and for the purpose of injuring the plaintiff in its business because of its refusal to in any way interfere with the rights of its employees to join or not to join a labor organization.' . . .

". . . *the Supreme Court* [of Wisconsin], noting that the facts as to which the request was made were undisputed, *drew the inference* from the undisputed facts *and itself made the finding.*[*] It canvassed the whole circumstances surrounding the picketing and held that 'One would be credulous, indeed, to believe under the circumstances that the union had no thought of coercing the employer to interfere with its employees in their right to join or refuse to join the defendant union.' Such picketing, the court held, was for 'an unlawful purpose,' since Wis. Stat. §111.06 (2)(b) made it an unfair labor practice for an employee individually or in concert with others to 'coerce, intimidate or induce any employer to interfere with any of his employes in the enjoyment of their legal rights . . . .' . . .

"Soon, however, the Court came to realize that the broad pronouncements, but not the specific holding, of Thornhill [v. Alabama] had to yield 'to the impact

---

[*] Italics throughout, ours.

of facts unforeseen,' or at least not sufficiently appreciated. Cf. People v. Schweinler Press, 214 N. Y. 395, 108 N.E. 639, 28 Harv. L. Rev. 790. Cases reached the Court in which a State had designed a remedy to meet a specific situation or to accomplish a particular social policy. These cases made manifest that picketing, even though 'peaceful,' involved more than just communication of ideas and could not be immune from all state regulation. 'Picketing by an organized group is more than free speech, since it involves patrol of a particular locality and since the very presence of a picket line may induce action of one kind or another, quite irrespective of the nature of the ideas which are being disseminated.' Bakery Drivers Local v. Wohl, 315 U. S. 769, 776 (concurring opinion); see Carpenters Union v. Ritter's Cafe, 315 U. S. 722, 725-728.

"These latter two cases required the Court to review a choice made by two States between the competing interests of unions, employers, their employees, and the public at large. In the Ritter's Cafe case, Texas had enjoined as a violation of its antitrust law picketing of a restaurant by unions to bring pressure on its owner with respect to the use of nonunion labor by a contractor of the restaurant owner in the construction of a building having nothing to do with the restaurant. . . .

"The implied reassessments of the broad language of the Thornhill case were finally generalized in a series of cases *sustaining injunctions against peaceful picketing, even when arising in the course of a labor controversy,* when such picketing was counter to valid state policy in a domain open to state regulation. The decisive reconsideration came in Giboney v. Empire Storage & Ice Co., 336 U. S. 490. A union, seeking to organize peddlers, picketed a wholesale dealer to induce it to refrain from selling to nonunion peddlers.

The state courts, finding that such an agreement would constitute a conspiracy in restraint of trade in violation of the state antitrust laws, enjoined the picketing. This Court affirmed unanimously.

" 'It is contended that the injunction against picketing adjacent to Empire's place of business is an unconstitutional abridgement of free speech *because the picketers were attempting peacefully to publicize truthful facts about a labor dispute.* . . . But the record here does not permit this publicizing to be treated in isolation. . . .'

"The Court therefore concluded that it was 'clear that appellants were doing more than exercising a right of free speech or press. . . . They were exercising their economic power together with that of their allies to compel Empire to abide by union rather than by state regulation of trade.' Id., at 503.

"The following Term, the Court decided a group of cases applying and elaborating on the theory of Giboney. In Hughes v. Superior Court, 339 U. S. 460, the Court held that the Fourteenth Amendment did not bar use of the injunction to prohibit picketing of a place of business solely to secure compliance with a demand that its employees be hired in percentage to the racial origin of its customers. . . .

"On the same day, the Court decided Teamsters Union v. Hanke, 339 U. S. 470, holding that a State was not restrained by the Fourteenth Amendment from enjoining picketing of a business, conducted by the owner himself without employees, in order to secure compliance with a demand to become a union shop. . . .

"A third case, Building Service Employees v. Gazzam, 339 U. S. 532, was decided the same day. Following an unsuccessful attempt at unionization of a small hotel and refusal by the owner to sign a contract with the union as bargaining agent, the union began to

picket the hotel with signs stating that the owner was unfair to organized labor. The State, finding that the object of the picketing was in violation of its statutory policy against employer coercion of employees' choice of bargaining representative, enjoined picketing for such purpose. This Court affirmed, rejecting the argument that 'the Swing case, supra, is controlling. . . .'

"A similar problem was involved in Plumbers Union v. Graham, 345 U. S. 192, where a state court had enjoined, as a violation of its 'Right to Work' law, picketing that advertised that nonunion men were being employed on a building job. This Court found that there was evidence in the record supporting a conclusion that *a substantial purpose of the picketing* was to put pressure on the general contractor to eliminate nonunion men from the job and, on the reasoning of the cases that we have just discussed, held that the injunction was not in conflict with the Fourteenth Amendment.

"This series of cases, then, established a broad field in which a State, in enforcing some public policy, whether of its criminal or its civil law, and whether announced by its legislature or its courts, *could constitutionally enjoin peaceful picketing* aimed at preventing effectuation of that policy.

"In the light of this background, the Maine Supreme Judicial Court in 1955 decided, on an agreed statement of facts, the case of Pappas v. Stacey, 151 Me. 36, 116 A. 2d 497. From the statement, it appeared that three union employees went on strike and *picketed a restaurant peacefully 'for the sole purpose of seeking to organize other employees* of the Plaintiff, ultimately to have the Plaintiff enter into collective bargaining and negotiations with the Union . . . .' Maine had a statute providing that workers should

have full liberty of self-organization, free from restraint by employers or other persons. *The Maine Supreme Judicial Court drew the inference* from the agreed statement of facts that 'there is a steady and exacting pressure upon the employer to interfere with the free choice of the employees in the matter of organization. To say that the picketing is not designed to bring about such action is to forget an obvious purpose of picketing—*to cause economic loss to the business* during noncompliance by the employees with the request of the union.' 151 Me., at 42, 116 A. 2d at 500. It therefore, enjoined the picketing, and an appeal was taken to this Court.

"The whole series of cases discussed above allowing, as they did, wide discretion to a State in the formulation of domestic policy, and not involving a curtailment of free speech in its obvious and accepted scope, led this Court, without the need of further argument, to grant appellee's motion to dismiss the appeal in that it no longer presented a substantial federal question. 350 U.S. 870.

"The Stacey case is this case. As in Stacey, the present case was tried without oral testimony. As in Stacey, the *highest state court drew the inference from the facts that the picketing was to coerce the employer* to put pressure on his employees to join the union, in violation of the declared policy of the State. (For a declaration of similar congressional policy, see §8 of the National Labor Relations Act, 61 Stat. 140, 29 U.S.C. §158.) The cases discussed above all hold that, consistent with the Fourteenth Amendment, a State may enjoin such conduct."[*]

---

[*] The dissenting opinion of Justice DOUGLAS (supported by the Chief Justice and Justice BLACK) illuminates the evolution and the present status of the law. Mr. Justice DOUGLAS said (pp. 295, 297) : "The Court has now come full circle. . . . Today, the Court signs

The law of Pennsylvania is and has been in accord with the above mentioned principles and decisions. In *Wortex Mills v. Textile Workers Union*, 369 Pa. 359, 85 A. 2d 851, we analyzed the decisions and said (pages 365, 366):

"It is well to recall that a State or other Sovereign has a paramount right and an inescapable duty to maintain law and order, *to protect life, liberty and property* and to enact laws and police regulations for the protection and preservation of the safety, health and welfare of the people of the state or community; Carnegie-Illinois Steel Corp. v. U. S. W. of A., 353 Pa. 420, 426, 45 A. 2d 857; Westinghouse Electric Corp. v. United Electrical Workers, 353 Pa. 446, 460, 46 A. 2d 16.

" 'The power and duty of the State to take adequate steps to preserve the peace and to protect the privacy, the lives, and the property of its residents cannot be doubted': Thornhill v. Alabama, 310 U. S. 88, 105; Carlson v. California, 310 U. S. 106, 113. . . .

"In Hughes v. Superior Court of California, 339 U. S. 460, the Supreme Court of the United States upheld the use of an *injunction* issued by a State Court *to prohibit peaceful picketing* (in order to secure compliance with the union's demand that its employes be in proportion to the racial origin of its then customers), in violation of the policy of a State. . . . '. . . But while picketing is a mode of communication it is inseparably something more and different. Industrial picketing "is more than free speech, since it involves patrol of a particular locality and since the very presence of a picket line may induce action of

the formal surrender . . . . State courts and state legislatures are free to decide whether to permit or suppress any particular picket line for any reason other than a blanket policy against all picketing."

one kind or another, quite irrespective of the nature of the ideas which are being disseminated." . . . It has been amply recognized that picketing, not being the equivalent of speech as a matter of fact, is not its inevitable legal equivalent. *Picketing is not beyond the control of a State if the manner in which picketing is conducted or the purpose which it seeks to effectuate gives ground for its disallowance.* See Dorchy v. Kansas, 272 U. S. 306; Milk Wagon Drivers Union v. Meadowmoor Dairies, Inc., 312 U. S. 287; Hotel and Restaurant Employees' International Alliance v. Wisconsin E. R. B., 315 U. S. 437; Carpenters & Joiners Union v. Ritter's Cafe, 315 U. S. 722; Giboney v. Empire Storage & Ice Co., 336 U. S. 490. *"A state is not required to tolerate in all places and all circumstances even peaceful picketing by an individual."* Bakery & Pastry Drivers & Helpers Local v. Wohl, supra, at 775.'

. . .

"Picketing is not protected by the Federal Constitution and may be enjoined by a State Court where the picketing is for the purpose of compelling an employer to violate a penal statute: Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 69 S. Ct. 684; or to violate the public policy of a state, statutorily or judicially declared: Building Service Union v. Gazzam, 339 U.S. 532, 70 S. Ct. 784; Hughes v. Superior Court of California, 339 U.S. 460; Carpenters & Joiners Union v. Ritter's Cafe, 315 U.S. 722; Wilbank v. Chester & Delaware Counties Bartenders, etc., Union, 360 Pa. 48, 60 A. 2d 21; or where its objective will cause a violation of a State's Anti-Trust Act: Carpenters Union v. Ritter's Cafe, 315 U.S. 722; or where picketing is conducted by a union to force a closed shop: Phillips v. United Brotherhood of Carpenters, etc., 362 Pa. 78, 66 A. 2d 227; or where it is conducted with violence or by a

sit-down strike or by a similar technique: Labor Board v. Fansteel Corp., 306 U.S. 240; Westinghouse Electric Corp. v. United Electrical etc., 353 Pa. 446, 46 A. 2d 16; Carnegie-Illinois Steel Corp. v. U.S.W. of A., 353 Pa. 420, 45 A. 2d 857; or where it is enmeshed in a context of violence: Drivers Union, etc. v. Meadowmoor, etc., 312 U.S. 287."

A State Court may enjoin a labor union from peacefully picketing the place of business of a self-employer in order to compel him to join the union or adopt a union shop or union wages or hours: *International Brotherhood of Teamsters v. Hanke*, 339 U.S. 469; *Grimaldi v. Local No. 9*, 397 Pa. 1, 153 A. 2d 214. Moreover, an injunction may be issued to restrain peaceful "organizational" or "recognition" picketing if *one* of the objects or purposes of the picketing, even though not the sole object, is unlawful—for example "if its purpose is to coerce the employer to compel or require his employes to join the union: International Brotherhood of Teamsters Union, Local 309 v. Hanke, 339 U.S. 470; Wilbank v. Chester and Delaware Counties Bartenders, Hotel and Restaurant Employes Union, 360 Pa. 48, 52, 60 A. 2d 21, 23; Garner v. Teamsters, Chauffeurs and Helpers, Local Union No. 776, 373 Pa. 19, 22, 94 A. 2d 893, 895; Baderak v. Building and Construction Trades Council, 380 Pa. 477, 482, 112 A. 2d 170, 173": *Anchorage, Inc. v. Waiters & Waitresses Union*, 383 Pa. 547, 119 A. 2d 199. Also: *Building Service Employees v. Gazzam*, 339 U.S. 532; *Sansom House Enterprises v. Waiters & Waitresses Union*, 382 Pa. 476, 115 A. 2d 746; *Phillips v. United Brotherhood of Carpenters*, 362 Pa. 78, 66 A. 2d 227; *International Brotherhood of Teamsters v. Vogt, Inc.*, 354 U.S. 284 and cases cited therein.

Realistically speaking, it is clear beyond even the peradventure of a doubt, that the real object and cer-

tainly one of the objects of the present picketing is to coerce the Club into requiring its employees to join the union; and consequently even if the Pennsylvania Labor Relations Act were applicable to a hospital or club (which it is not) the Court must enjoin this violation of the Act!

*Neither the Labor Anti-Injunction Act nor the Pennsylvania Labor Relations Act have deprived a Court of Equity of its Jurisdiction or power to enjoin this picketing.*

The Courts of Equity under the Act of June 16, 1836, and the Act of February 14, 1857, have always had and continue to have jurisdiction and power to grant or refuse injunctive relief, even in labor disputes, except where that jurisdiction or power has been expressly or clearly annulled by the Legislature: *Northampton Area Joint School Authority v. B. & C. Trades Council*, 396 Pa. 565, 152 A. 2d 688; *School District of West Penn Township v. International Brotherhood of Electrical Workers*, 396 Pa. 408, 145 A. 2d 258; *Carnegie-Illinois Steel Corp. v. United Steel Workers*, 353 Pa. 420, 45 A. 2d 857; *Westinghouse Electric Corp. v. United Electrical etc.*, 353 Pa. 446, 46 A. 2d 16; *Western Pennsylvania Hospital v. Lichliter*, 340 Pa. 382, 17 A. 2d 206; See also: *International Teamsters v. Hanke*, 339 U.S. 470; *Grimaldi v. Local No. 9*, 397 Pa., supra.

The Pennsylvania Labor Relations Act of *June 1, 1937*, and the Labor Anti-Injunction Act of *June 2, 1937, each* of which was amended on *June 9*, 1939, were unquestionably, as history and a reading of them will show, companion interrelated pieces of legislation and they must be construed together.

The Pennsylvania Labor Relations Act (as amended) created the Pennsylvania Labor Relations Board (pertinently) "to protect the right of employees

to organize and bargain collectively . . . [and] declaring certain labor practices by *employers* to be unfair . . . [and] empowering the board to prevent *any person* from engaging in any unfair labor practice." The term *"person"* was broadly defined to "include an individual, partnership, association, corporation, legal representative, trustee in bankruptcy, receiver or labor organization". Section 3(b).

"The term 'employer' includes *any person* acting, directly or indirectly, in the interest of an employer" with certain exceptions not here relevant. Section 3(c).

"The term 'labor dispute' includes any controversy concerning—(1) terms, tenure or conditions of employment; or concerning (2) the association or representation of persons in negotiating, fixing, maintaining, changing or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee." §3(h).

"The term 'employee' shall include *any employee,* and shall not be limited to the employees of a particular employer . . . but shall not include any individual employed as an agricultural laborer, or in the domestic service of any person in the home of such person, or any individual employed by his parent or spouse." Section 3(d).

If considered alone, the term *"any person"* and the term "employer", as defined in the Labor Relations Act are sufficiently broad to include hospitals, charities and social clubs, as well as industry, commerce and all businesses which employ employees; and the term "employee" is likewise sufficiently broad to include "any employee" who works for a hospital, charity or social club, as well as for an industrial, commercial or business concern.

The definition of a "labor dispute" is, in all material respects, identical in each Act, and if considered alone, is sufficiently broad to include any controversy concerning terms or conditions of employment, etc., in hospitals, charities and social clubs, as well as in industry, commerce or businesses.

However, when interpreting this Act, as well as the inter-related Labor Anti-Injunction Act, the majority has overlooked the well settled principle that (a) the *entire* Act must be considered, and (b) the language of the Act, if ambiguous, must be considered in connection with the mischief sought to be remedied, and (c) the Act must be construed so as not to produce an unreasonable or absurd result: *Sherwood v. Elgart*, 383 Pa. 110, 117 A. 2d 899; *Salvation Army Case*, 349 Pa. 105, 36 A. 2d 479; *Seburn v. Luzerne & Carbon County Motor Transit Co.*, 394 Pa. 577, 148 A. 2d 534. Construing the Labor Relations Act in its entirety, this Court, over the vigorous and repeated contentions of the unions, has repeatedly and expressly held that *the Act was intended to apply only in cases arising in industry, commerce or business, and has no application to employment relations or disputes* or controversies arising *between employer and employees of hospitals, charities or social clubs*: *Salvation Army Case*, 349 Pa. supra; *Overbrook Golf Club Case*, 385 Pa. 358, 123 A. 2d 698 (where the Club operated a restaurant and a bar for the pleasure and accommodation of its members and guests, as does the Locust Club); *Pennsylvania Labor Relations Board v. Mid Valley Hospital Association*, 385 Pa. 344, 124 A. 2d 108; *Western Pennsylvania Hospital v. Lichliter*, 340 Pa. 382, 17 A. 2d 206.

In the *Overbrook Golf Club Case*, Mr. Justice (now Chief Justice) JONES, said (pages 362, 363): "A detailed review of the provisions of the [Labor Relations] Act, . . . led us 'irresistably' in the Salvation Army case

to the conclusion that the legislature meant to limit the provisions of the Act to *industrial pursuits* and therefore, 'intended all of the statutory provisions and regulations of the Act to apply *exclusively* to *industrial* disputes.' *Hence, the term 'employer', as used in the Act, does not embrace a hospital, as in the 'Western Pennsylvania Hospital case, or a charitable or eleemosynary institution, as in the Salvation Army* case. . . . The criterion for determining whether an employer is subject to the . . . Act would seem to be, more particularly, whether he is engaged in an industrial or commercial activity rather than that he operates it as a non-profit enterprise."

The majority opinion, the lower Court, and the unions seek to distinguish the Labor Relations Act from the Labor Anti-Injunction Act because the definition of "employer" and of "employee" and of "labor dispute" is slightly different. The language and interrelationship of the two Acts, the prior decisions of this Court as well as the rationale of these decisions, demonstrate that there is no legal or justifiable reason for any distinction in their application to this case.

The *Labor Anti-Injunction Act* of June 2, 1937, as amended June 9, 1939, pertinently provides in §3 :

"(g) The term 'employer' is declared to include master, and shall also include natural persons, partnerships, unincorporated associations, joint-stock companies, corporations for profit, corporations not for profit,* receivers in equity, and trustees or receivers in bankruptcy.

"(h) The term 'employe' is declared to include *all* natural persons who perform services for other persons, and shall not be limited to the employes of a particular employer, . . ."

---

* The reason for including "corporations not for profit" is clearly set forth infra in *Salvation Army Case*, 349 Pa. 105.

If considered alone, the term "employer" is sufficiently broad to include hospitals, charities and social clubs, as well as industrial, commercial and business concerns; and the term "employee", considered alone, is likewise sufficiently broad to include *all* persons who perform services for hospitals, charities and social clubs, as well as for industrial, commercial and business concerns; and the definition of a "labor dispute" (which in each Act was almost the same), was sufficiently broad to include all labor controversies arising in connection with terms and conditions of employment etc., of employees in hospitals, charities and clubs, as well as in industrial, commercial and business concerns. Nevertheless, considering the *Labor Anti-Injunction Act in its entirety* (as well as in conjunction with the Labor Relations Act), this Court has specifically, directly, squarely and expressly held in *Western Pennsylvania Hospital v. Lichliter*, 340 Pa., supra, that neither the Labor Anti-Injunction Act nor the Pennsylvania Labor Relations Act applied to a hospital, or precluded a Court of Equity from enjoining the peaceful picketing of a hospital and the attempted unionization of unskilled hospital employees.

Before reviewing the *Western Pennsylvania Hospital* case it is important to note the inter-connection or inter-relationship of the two Acts. The Labor Anti-Injunction Act of (June 2) 1937, as amended in 1939, provided in §4(a) that *the Act shall not apply* in any case:

"(a) Involving a labor dispute, as defined herein, which . . . tends to procure the disregard, breach, or violation of, a valid subsisting labor agreement arrived at between an employer and the representatives designated or selected by the employes for the purpose of collective bargaining, as defined and provided for in the act, approved the first day of June, one thousand nine

hundred and thirty-seven [the Pennsylvania Labor Relations Act] . . . and amendments thereto, . . . Provided, however, That the complaining person has not, during the term of the said agreement, committed an act as defined in both of the aforesaid acts [the Pennsylvania Labor Relations Act and the National Labor Relations Act] as an unfair labor practice or violated any of the terms of said agreement." Moreover, the 1939 amendment to the Anti-Injunction Act provided that it "shall not apply (§4) : (c) Where any person, . . . employe, labor organization, . . . engages in a course of conduct *intended or calculated to coerce an employer to commit a violation of the Pennsylvania Labor Relations Act of 1937 . . . .*"

It is clear, therefore, that the Legislature intended the Labor Anti-Injunction Act to be a companion, interrelated, interdependent Act to the Pennsylvania Labor Relations Act, and that the *Labor Anti-Injunction Act* (which annulled Equity's jurisdiction in certain labor disputes) *would apply only when and where the Pennsylvania Labor Relations Act applied.* It follows inevitably that when this Court has repeatedly held that the Pennsylvania Labor Relations Act *applies only to industrial* and commercial disputes, *and has no application to employment or labor disputes arising in hospitals, charities or social clubs,* those decisions are *equally applicable* to injunctive relief in cases involving labor disputes arising in hospitals, charities or social clubs.

This is made indisputably clear in *Western Pennsylvania Hospital v. Lichliter,* 340 Pa. 382, 17 A. 2d 206. In *Western Pennsylvania Hospital* case, plaintiff hospital was granted an injunction (1) *restraining hospital workers local union* from attempting to peacefully organize the hospital employees and from asserting any rights against the hospitals and (2) like-

wise restraining the Pennsylvania Labor Relations Board from proceeding in any way under the Pennsylvania Labor Relations Act against the hospital, since those labor disputes were outside its jurisdiction. The hospitals were public charitable institutions which were supported in part by State appropriations, in part by charitable contributions, and in part by fees or charges paid by the sick, the injured, the disabled or dying. The hospitals employed over 5,000 persons including clerks, stenographers, bookkeepers, elevator operators, mechanics, cooks and cleaning women, as well as nurses and doctors. We note parenthetically that each of these groups, except nurses and doctors, are employed in social clubs. The hospitals perform a marvelous and indispensable public service to all mankind, irrespective of race, creed or color. For their services the hospitals charge those who are able to pay, but give *free* service to the indigent and the poor at a cost of several million dollars, of which amount the State contributes less than one-third. Nearly all the hospitals operated at a deficit. The union sought to organize the hospital *employees* (excluding doctors and nurses) which would have entailed an increased yearly outlay of over two million dollars,* and when the hospitals refused to negotiate an agreement with the union, the union invoked the jurisdiction of the Labor Board and charged unfair labor practices. Notwithstanding that the Labor Anti-Injunction Act applied to employers including "corporations for profit" and

---

* It is a matter of common knowledge that most hospital employees are paid extremely low wages, but they receive an additional intangible recompense in the knowledge that they are rendering a vital public service, and if they were paid a wage comparable to that paid in industry many of the charitable public hospitals which render an indispensable public service for the sick, the ill and the dying, could no longer exist.

"corporations not for profit", and did not exempt hospitals, this Court held that hospitals were not included in the Act,[*] and affirmed the injunction and the decree of the Court below "on the comprehensive opinion of Judge RICHARDS". We quote therefrom (pages 386, 387, 388):

"We think it will simplify matters to decide at the outset *whether or not the Labor Anti-Injunction Act applies* to the present situation. If so, the Court was without authority to issue the preliminary injunction before hearing: Sec. 9.

"Our first consideration is: Does a labor dispute exist? It is provided in Sec. 3(a) of the Act that:

" '(a) A case shall be held to involve or grow out of a labor dispute when the case involves persons who are engaged in a single industry, trade, craft, or occupation. . . .'

"A hospital is not an industry. . . .

"Even though the words of the statute be interpreted as broad enough to include the operations of a hospital, we do not think that the legislature intended such a result. . . . To show the scope of the Act, the Legislature attempted to define cases which 'involve or grow out of a labor dispute.' In doing so, it used the words 'industry, trade, craft or occupation'. It has not been the custom in the past to unionize hospitals. The effect of unionization and attendant efforts to enforce demands would involve results far more sweeping and drastic than mere property rights. The question of profits for the employer or wages for the employee are not alone involved. It is not merely a matter of suspending operations, ceasing work and stopping production, such as might be true in a steel mill or automobile factory. It is a question of pro-

---

[*] See: *Salvation Army Case*, 349 Pa. 105, infra.

tecting the health, safety and, in many cases, the very lives of those persons who need the service a hospital is organized to render. The results are quite different and more extensive than are involved in an ordinary labor dispute. We cannot conceive that the Legislature intended to include hospitals within the purview of the Act. . . ."

" '. . . Frequently words of general meaning are used in a statute, words broad enough to include an act in question, and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, or of the absurd results which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended to include the particular act.'

"We are convinced not only that *the words used in the Act have no application to a hospital, that no labor dispute is involved as defined by the Act,* but also that the effects of holding to the contrary would be so dangerous, disastrous and absurd as not to be within the intent of the legislature. Hence, *we hold that the Labor Anti-Injunction Act is not applicable, and that nothing therein legally deprived the Court of the power to issue the preliminary injunction* in this case, . . . .

"We have already outlined our views as to the applicability of the Labor Anti-Injunction Act to hospitals. All that we have said is equally true with reference to the Pennsylvania Labor Relations Act."

Judge RICHARDS then reviewed in detail the Pennsylvania *Labor Relations* Act of June 1, 1937, as amended, and the jurisdiction of the Court and of the Labor Relations Board and administrative remedies. The Court then said (page 393) :

"We conclude, that the plaintiff hospitals are not obliged to pursue the administrative remedies afforded; that neither the Pennsylvania Labor Relations Act

*nor the Labor Anti-Injunction Act apply to the present situation; and that this Court had the power, and it was its duty, to grant the preliminary injunction* under the circumstances of this case, . . . ."

This Court, we repeat, affirmed the decree of the Court below "on the comprehensive opinion of Judge RICHARDS". This is the law of Pennsylvania! This Court has repeatedly reaffirmed the *Western Pennsylvania Hospital* case and has rejected the oft-repeated contention of the unions that the *Western Pennsylvania Hospital* case *merely* decided "(1) that a hospital receiving state aid was exempted from . . . the Pennsylvania Labor Relations Act as it was performing a governmental function; and (2) that the [Labor Relations] act did not apply to nonindustrial disputes." It is crystal clear from a reading of the Court's opinion in that case, and it is likewise evident from the majority opinion in this case, that such a restrictive interpretation is an absolutely incorrect interpretation of the Court's decision in the *Western Pennsylvania Hospital* case.

In *Salvation Army Case*, 349 Pa. 105, 36 A. 2d 479, this Court in its opinion said (inter alia, pages 106-7) :

"In Western Pennsylvania Hospital et al. v. Lichliter et al., 340 Pa. 382, 17 A. 2d 206, we affirmed, per curiam, the judgment of the Common Pleas Court of Dauphin County, *which decided* that *the Labor Anti-Injunction Act* of June 2, 1937, P. L. 1198, as amended by the Act of June 9, 1939, P. L. 302, 43 PS section 206, and the Pennsylvania Labor Relations Act, *supra, related exclusively to employers and employes engaged in industrial pursuits.\** . . ." See also *Overbrook Golf Club Case*, 385 Pa. 358, 123 A. 2d 698.

---

\* The reason for the inclusion of a "corporation not for profit", under the definition of an "employer", in the Labor Anti-Injunction Act is apparent from the *Salvation Army Case*, supra. In that

The majority opinion attempts to draw a legal distinction between a hospital on the one hand, and a charity or social club on the other hand. The Labor Anti-Injunction Act and the Pennsylvania Labor Relations Act *will be searched in vain for any distinction* between a hospital on the one hand, and a charity or a social club on the other hand. Certainly the majority opinion has been unable to point to any language which draws such a distinction. These Acts either apply to *every labor dispute,* no matter whether it arises in industry commerce or business, or in a hospital, a charity or a social club, or, on the contrary, they apply only, as this Court has repeatedly held, to labor disputes in industrial, commercial and business enterprises, *and have no application whatsoever to labor disputes arising in hospitals or charities or social clubs.* This is further confirmed by the prior decisions of this Court which draw no legal or legislative distinction between hospitals on the one hand, and charities or social clubs on the other hand, but apply the Acts equally to all of them.

---

case the Court pointed out (pages 110-111) the distinction and delineation in this field: "We do not mean to decide or imply that whenever a non-profit organization does enter an industrial field, even though its profits may be devoted to charity, it is exempted from the taxes and regulations such as the Labor Relations Act to which any other industry or business is subjected. Compare: Y.M.C.A. of Germantown v. Philadelphia, 323 Pa. 401, 187 A. 204, in which the Y.M.C.A. rented commercially part of its premises to lodgers; The Contributors to the Pennsylvania Hospital v. The County of Delaware et al., 169 Pa. 305, 32 A. 456, in which a private hospital operated farms for profit; American Sunday School Union v. Philadelphia, 161 Pa. 307, 29 A. 26, in which a Sunday school union conducted a book store for profit: Trustees of Columbia University, etc., Decision No. 2552, Case No. SE9232, of the State Labor Relations Board of New York, in which a university owned and operated an office building. See Penna. Co., etc., Tr. v. Philadelphia et al., 346 Pa. 406, 31 A. 2d 109."

The majority opinion states: ". . . it is obvious that the operation of a club, such as the present one, is different from the operation of a hospital . . ." and is like any restaurant or hotel. "The controlling feature is that the employees of the non-profit club perform the identical wage earning duties performed by other employees in profit-making establishments such as hotels and restaurants and thus are engaged in an occupation which gives both an interest in their mutual wages or working conditions." These conditions and these statements are equally applicable to unskilled hospital employees. A hospital is larger in size and operation than a charity or a social club, and much more important, the degree of harm which would result from picketing a hospital is far, far greater than the harm which would result from picketing a charity or social club. However *there is no legal difference between a hospital and a charity and a non-profit club.* A hospital is just as much "an employer" as a charity or a social club, and "its employees" are just exactly the same as similar employees who are employed in social clubs, or indeed in industry or business. A hospital employs cooks, mechanics, clerks, stenographers, bookkeepers, elevator operators, cleaning women, and similar employees—exactly the same kind, group or classification of persons as does a social club. The proof of the pudding is in the eating—the unions are attempting to unionize all of these hospital employees exactly the same as they are attempting to unionize similar employees of social clubs.

The Merits

The majority admit, as they must, (1) that neither the employees of a hospital or social club, nor the union has any standing before the Pennsylvania Labor Relations Board; and—notwithstanding the broad language of that Act which gives the Board jurisdiction

and power over every labor dispute or controversy, and over terms or conditions of employment, as well as to prevent "any person" from engaging in an unfair labor practice,—(2) that the Board has no jurisdiction of this dispute because its jurisdiction is limited to *labor disputes in industry and business*, and does not include hospitals, charities or social clubs.

The majority base their decision on the merits principally upon the following part of their opinion: "The Chancellor here found that the picketing was constitutionally protected and within the public policy of the Commonwealth. Upon this finding he predicated his refusal to enjoin it. It is well settled that the basic findings of the Chancellor, supported by the Record and affirmed by the court en banc, will not be disturbed on appeal." This well settled principle is, as stated, both inaccurate and inapposite—it applies to genuine findings of fact, not to inferences or deductions from facts, or to conclusions of law: *Eways v. Reading Parking Authority*, 385 Pa. 592, 601, 124 A. 2d 92. In that case the Court said (page 601):

" 'Findings of fact made by a Chancellor who saw and heard the witnesses, when confirmed by the Court en banc, will not be reversed on appeal if they are supported by adequate evidence: Pregrad v. Pregrad, 367 Pa. 177, 80 A. 2d 58; Barrett v. Heiner, 367 Pa. 510, 80 A. 2d 729. However, that well-settled principle is confined to findings which are true and genuine findings of fact. "With respect to [a] inferences and deductions from facts and [b] conclusions of law, both the Court en banc and the appellate Courts have the power to draw their own inferences and make their own deductions and conclusions: Barrett v. Heiner, 367 Pa. 510, 80 A. 2d 729; Noonan Estate, 361 Pa. 26, 63 A. 2d 80; Payne v. Winters, 366 Pa. 299, 77 A. 2d 407; Smith v. Smith, 364 Pa. 1, 70 A. 2d 630.": Kalyvas v.

Kalyvas, 371 Pa. 371, 375-376, 89 A. 2d 819.' " See to the same effect: *West Penn Township v. International Brotherhood,* 396 Pa., supra; *Sansom House Enterprises v. Waiters & Waitresses Union,* 382 Pa., supra; *Anchorage, Inc. v. Waiters & Waitresses Union,* 383 Pa., supra; *International Brotherhood of Teamsters v. Vogt, Inc.,* 354 U. S. 284, and cases cited therein.

In *Sansom House* the Court said (page 481) : "The court below found that the picketing was not for that purpose [of coercing the employer to require its employees to join the union], but such a finding is merely an inference or deduction from the testimony and is therefore reviewable by this court: . . . ." This Court then reversed the lower Court's finding and entered an injunction.

In the *West Penn Township* case, this Court reversed the decree of the lower Court and directed it to enter a preliminary injunction restraining the peaceful picketing. The Court said (page 413) : "It is clearly settled that an appellate court is able to draw its own inferences, deductions and conclusions, as well as determine the proper legal interpretation to be placed upon the evidence; and this is especially true when plaintiffs' material testimony has not been contradicted or impeached."

It is clear and indisputable that the aforesaid conclusions of the lower Court were not findings of fact, as the majority erroneously assert—they were clearly conclusions of law, which, as we have demonstrated, are erroneous.

The majority opinion further holds that even if a Court of Equity has jurisdiction to restrain this picketing of the Locust Club, the historical background of unions and their (alleged) right to use "economic pressure to persuade* the club to recognize and bar-

---

* A euphemistic expression of "coercion".

gain" with the union, require this Court to affirm the refusal of the lower Court to issue an injunction. With this conclusion we are in entire disagreement.

A union is a group of working men banded together to protect themselves against any unjust act of, or overreaching by, their employer, and to obtain higher wages (including so-called fringe benefits), shorter hours and better working conditions in the industry or business in which they are employed.

The union movement was of slow growth in the United States. It was strongly favored by the American people because for many years the working man was the "little fellow" or "under-dog" who was frequently taken advantage of by an employer in long hours of work and/or in little pay and/or in inadequate or dangerous working conditions. The unions grew from babyhood to childhood to manhood and, within the last twenty years, to Gianthood. The unions are no longer weaklings who need further special protection and privileges and immunities* beyond those given to other Americans; they are unquestionably the most influential and the most powerful group of people in our Country today. Because their power is so great, union leaders too often fail to realize that great power must, for the protection and welfare of society, be accompanied by great responsibility, and by greater consideration for the welfare of our Country. It seems to be often forgotten that members of a union are Americans like all the rest of us, and like every other American citizen they are and certainly should be subject to the Constitution and the Law.

---

* For example, unions are exempt from the anti-trust laws (Act of October 15, 1914, c. 323, §6, 38 Stat. 731; 15 U.S.C. §17); and from income taxes (Act of August 16, 1954, c. 736, 68 Stat. 163; 26 U.S.C. §501(c)); and Congress has given them other special privileges and immunities.

Plaintiff refused to recognize defendant union for the purpose of collective bargaining. On October 18, *1956,* defendant union declared a strike against plaintiff and set up a picket line. At that time there were 19 persons employed by the Locust Club. Twelve of these employees signed membership cards with the union, but only 9 of them participated in the strike. The 9 who participated in the strike have been replaced by the Club. The majority opinion admits that the Locust Club was not covered by the Pennsylvania Labor Relations Act, and consequently *it was not compelled* to bargain with the union, although of course it had a lawful right, if it so desired, to recognize or to bargain with a union which represents a majority of the employees. It is not and cannot be disputed that the employees had a right to leave their employment if they desired, and the Club was within its legal rights in discharging its employees who went on strike.* I agree with the able dissenting opinion of President Judge HAGAN that under such circumstances, *the union no longer represented any of the Club's employees.*

However, I prefer to place the disposition of this case, on the merits, on a broader ground. Realistically, by usage and custom, as everyone knows, picketing has become in many cases an economic club to *compel* an employer to recognize a union and/or to accede to its demands, or alternatively, to suffer great financial loss or ruin. If after a reasonable period of picketing, a majority of the employees do not join the union, the employer is between Scylla and Charybdis—he must choose between likely ruin or committing an unfair labor practice.

---

* There is no doubt that in a hiring at will or for a definite period of time, an employee has a right to resign and an employer has a right to discharge his employee, unless it violates the agreement of hiring or an applicable statute.

The Amendment of June 9, 1939, to the *Labor Anti-Injunction Act* provides in §4(c) that it is an unfair labor practice "where any person . . . employe, labor organization . . . *engages in a course of conduct intended or calculated to coerce an employer* to commit a violation of the Pennsylvania Labor Relations Act of 1937 . . . ." i.e., intended to coerce an employer to induce or compel his employees to join a union.

In *Jefferson & I. Coal Co. v. Marks*, 287 Pa. 171, 134 A. 430, the Court granted an injunction against peaceful picketing, which the union alleged was for the purpose of organization. The Court, speaking through Chief Justice KEPHART, aptly said: "Persuasion, too long and persistently continued, becomes a nuisance and an unlawful form of coercion:* 32 C.J. 165, paragraph 227".

In *Anchorage, Inc. v. Waiters & Waitresses Union*, 383 Pa. 547, 119 A. 2d 199, the Court granted an injunction against peaceful picketing which the union alleged was for the purpose of organization. Speaking through Chief Justice STERN, the Court pertinently said (pages 551, 555):

"(5) Picketing may be enjoined if *one* of its objects is unlawful even though not the sole object: National Labor Relations Board v. Denver Building and Construction Trades Council, 341 U. S. 675, 689; International Brotherhood of Electrical Workers v. National Labor Relations Board, 341 U. S. 694, 700; Local 74, United Brotherhood of Carpenters and Joiners of America, A. F. of L. v. National Labor Relations Board, 341 U. S. 707, 713.** . . . It is, of course, true

---

* This same viewpoint, although denounced by union leaders, was expressed, we repeat, by Congress in its new Labor-Management Act of 1959, and by President Eisenhower who publicly termed such picketing "blackmail picketing".

** To these we add: *International Brotherhood of Teamsters v. Vogt*, 354 U. S. 284, and numerous cases cited therein; and

that picketing which is lawful does not necessarily become unlawful merely by the extended duration of time during which it may be carried on, but its persistence during such an extraordinary period is at least an evidential factor pointing inevitably to the conclusion that its real object was the harassment and oppression of the employer and not to carry on for so many years an attempt to induce the employes voluntarily to join the Union, which, if not successful within a reasonably limited period certainly could never succeed at all [without coercion]."

Assuming, *arguendo*, that peaceful picketing of a social club is lawful, if its purpose is to induce the employees to join the union, it is obvious that that original objective is no longer the union's real objective. It is a clear and inescapable conclusion that the present real purpose, object and intent of this picketing which has been persisted in since October, 1956, without gaining a single union member, is intended to *coerce* the Locust Club to require or compel its employees to join the union, in violation of the Pennsylvania Labor Relations Act of 1939.

For each of the many reasons hereinabove discussed it is clear that the picketing of the Locust Club should be enjoined. Moreover, if there were any doubts as to plaintiff's right to an injunction to restrain the union from further damaging plaintiff's property, it would be removed by a consideration of the Constitution and the rights of property ordained therein which, in the last two decades, have been frequently forgotten or eroded or abridged.

---

*Sansom House, Inc. v. Waiters & Waitresses Union,* 382 Pa. 476, 115 A. 2d 746; *Phillips v. United Brotherhood of Carpenters & Joiners,* 362 Pa. 78, 66 A. 2d 227.

The Constitution

Picketing is not mentioned in the Constitution, but the rights of *property* are. For centuries before the Constitution, the right of private property was one of the great basic rights of Western civilization. "To secure their property was one of the great ends for which men entered society. The right to acquire and own property, and to deal with it and use it as the owner chooses so long as the use harms nobody, is a natural right. It is part of the citizen's natural liberty—an expression of his freedom—guaranteed as inviolate by every American bill of rights": *Lord Appeal,* 368 Pa. 121, 130, 81 A. 2d 533.

Article I, §1 of the Constitution of Pennsylvania provides as one of the "Inherent Rights of Mankind": "All men . . . have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property . . . ."*

The Liberties which the people of the United States most highly prize are freedom of religion, freedom of speech, freedom to acquire, possess, use and protect private property, freedom of the press, and free elections. These are the freedoms which have distinguished us from peoples living under Communism, Fascism or Totalitarianism. It is high time, very high time, that more consideration be given to the fundamental rights of property which are ordained and guaranteed in the Constitution; and if there be any doubt as to whether those rights conflict with a statutory right, or with a judicially created right of picketing, the Constitution is paramount and must prevail.

For each and all these reasons I would reverse the Decree of the lower Court and I would enter a Decree

---

* See also the Fifth and Fourteenth Amendments to the Constitution of the United States.

restraining defendant, its agents and representatives, from picketing the Locust Club.

Mr. Justice Benjamin R. Jones joins in this dissenting opinion.